CRUMMER CO. et al.
v.
DU PONT et al.
Civ. No. 313–T.

United States District Court
N. D. Florida, Tallahassee Division.
Jan. 14, 1954.

Francis P. Whitehair, Deland, Fla., Robert J. Pleus, Orlando, Fla., Hewen A. Lasseter, Kissimmee, Fla., Chris J. Dixie, Houston, Tex., for plaintiffs.

Adair, Kent, Ashby & Crenshaw, Jacksonville, Fla., Charles R. Scott, Jacksonville, Fla., Maguire, Voorhis & Wells, Orlando, Fla., Atkinson & Atkinson, Tallahassee, Fla., Ralph M. McLane, Asst. Atty. Gen., for defendants.

DE VANE, Chief Judge.

This action was instituted by plaintiffs under the anti-trust laws of the United States, more particularly under Sections 1, 2 & 7 of the Act of July 2, 1890, generally known as the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C.A. §§ 1, 2, 15 note, and Sections 4, 12 & 14 of the Act of October 15, 1914, generally known as the Clayton Act, 38 Stat. 730, 15 U.S.C.A. §§ 15, 22, 24, and other relevant sections of the anti-trust laws of the United States applicable thereto. By appropriate orders the court has dismissed as party-defendants to this cause, Edward J. Mansfield, Walter R. Gall and Cummer Sons Cypress Company, a corporation. All defendants named in the caption are still parties to this litigation.

The specific question before the court at this stage of the proceeding is whether the facts alleged in the complaint, on plaintiffs' claim of fraudulent concealment, are legally sufficient to toll the statute of limitations.

## Applicable Statute of Limitations

There first arose in this case the question of what statute of limitations is applicable to this case and by its order of October 26, 1953 the court held the Florida three-year statute of limitations, F.S.A. § 95.11(5) (a), is applicable. This section reads as follows:

"(5) Within three years.—

"(a) An action upon a liability created by statute, other than a penalty of forfeiture".

The court did not, at that time, however, set forth its reasons for its conclusion that the three-year statute of limitations was applicable, for the reason that it then appeared that further argument would be necessary on the question now before the court before the court could pass upon whether or not, upon the face of the complaint, this case is barred by the statute of limitations. The court, therefore, at this time summarizes briefly below the controversy between the parties as to which statute of limitations is applicable and the court's reason for holding the three-year statute applicable.

Florida has no statute similar to the Sherman or Clayton Acts and in Florida a suit for damages growing out of a conspiracy is predicated upon the common-law right of a party to sue for such damages. The statute of limitations applicable in such a suit is Section 95.11(4), F.S.A., which provides as follows:

"(4) Within four years.—Any action for relief not specifically provided for in this chapter."

Plaintiffs contend that because Florida has no statute creating a liability for conspiracy that this court is bound to apply to this case the same statute of limitations that a State court would apply to a common-law action in the State for conspiracy. Counsel for plaintiffs conceded on argument that if Florida had an anti-trust act similar to the Sherman or Clayton Acts the three-year statute would be applicable, but having no such act they contend the four-year statute controls in this case. The Federal deci-

sions are almost unanimous to the contrary and the court, therefore, held and reaffirms here, that the three-year statute of limitations is applicable in this case. Foster & Kleiser Co. v. Special Site Sign Co., 9 Cir., 85 F.2d 742; State of Oklahoma ex rel. Phillips v. American Book Co., 10 Cir., 144 F.2d 585; Burnham Chemical Co. v. Borax, 9 Cir., 170 F.2d 569; McClellan v. Montana-Dakota Utilities Co., 8 Cir., 204 F.2d 166; Levy v. Paramount Pictures, D.C.Cal., 104 F. Supp. 787.

■■ The court, in its order of October 26, 1953, held that the doctrine of fraudulent concealment applies in private civil anti-trust actions and is applicable in this case if sufficiently alleged in the complaint. The court also held at the same time that the Federal Moratorium Act, 56 Stat. 781 and 59 Stat. 306, 15 U.S.C.A. § 16 note, is also applicable in this case and suspended the running of the statute of limitations from October 19, 1942 to June 30, 1946. This suit was instituted on December 19, 1949, which was more than three years after the termination of the Federal Moratorium Act. In the opinion of the court, as will be pointed out later, the conspiracy alleged in the complaint (if it, in fact, existed) terminated prior to June 30, 1946, and the statute of limitations began to run following that date, unless it was tolled by fraudulent concealment.

### The Plaintiffs' Claim

The complaint alleges that between and including the years 1920 and 1928 various Florida taxing units authorized, issued, sold and delivered, or otherwise disposed of in the aggregate, approximately one-half billion ($500,000,000) dollars par value initial securities. Between and including the years 1922 and 1928 a municipal investment dealer known as Brown-Crummer Investment Co., a corporation, organized under the laws of the State of Kansas in 1919, with its principal office located in that State, purchased in the aggregate over forty million ($40,000,000) dollars par value of the initial securities of various Florida taxing units and sold substantially all of them to investor customers located in other States in the United States. R. E. Crummer & Company was organized under the laws of the State of Delaware in 1934 and became successor to the business of the Brown-Crummer Investment Co., and the Crummer Company was organized under the laws of the State of Delaware in 1942 to become successor to and take over the business of R. E. Crummer & Company effective January 1, 1943. However, due to difficulties arising in the Crummer Company securing a certificate to do business in the State of Florida the plan to transfer the assets of the R. E. Crummer & Company to the Crummer Company was never consummated and both companies continued in business thereafter. All these corporations were organized to deal in municipal securities and confined their activities to such securities according to the complaint.

The complaint further alleges that the unprecedented financial and economical debacle beginning in 1929 brought about an almost total financial paralysis of the Florida taxing units with outstanding securities. The situation became so bad that by 1932 approximately eighty percent, in volume, of said initial securities were in default in the payment of principal, interest or both. The Brown-Crummer Investment Co. which had dealt in these securities prior to the debacle sent representatives, including R. E. Crummer, to Florida to make a study of the situation and following this study Mr. Brown, the largest stockholder, withdrew from the company and R. E. Crummer, also a stockholder, thereupon organized R. E. Crummer & Company, which took over the business of Brown-Crummer Investment Co. and became very active in plans being then advocated for the refinancing of outstanding taxing units securities in Florida.

The complaint alleges that R. E. Crummer, after extensive research into legal, economic and financial conditions of Florida taxing units and an analysis of their ability to pay, worked out a tempo-

rary refunding plan for the refunding of defaulted securities which was adopted and made effective and became known throughout the nation as the Crummer Temporary Refunding Plan.

The complaint further alleges that as the result of this plan R. E. Crummer & Company attained a pre-eminent position with the holders of Florida taxing units securities, the governing authorities of the taxing units, banking institutions and others interested in the refinancing of Florida taxing units securities, and as a result thereof from the year 1934 through the year 1942 made a net profit on its operations of approximately one and one-half million ($1,500,000) dollars and during the calendar year 1941 alone "sold or exchanged approximately forty million ($40,000,000.00) dollars par value of the taxing units securities to the investing public of the nation, which business constituted the largest volume of its kind ever handled by a single dealer of municipal securities in the history of public financing in the United States."

### The Alleged Ball-duPont Plan to Capture Florida

The complaint further alleges that on or about the year 1926 the late Alfred I. duPont and the defendants Jessie Ball duPont and Edward Ball, became legal residents of the State of Florida; that Alfred I. duPont was one of the three nationally known and immensely wealthy "duPont cousins" of Delaware; that he was advanced in years and failing in health at the time, but that, nevertheless, he soon embarked upon a program of "buying up" large land areas of Florida and vital business and financial institutions of the State; and to perfect this "buying up" program several corporations were formed, the principal of which was Almour Securities, Inc., to which Mr. duPont turned over originally approximately thirty-three million ($33,-000,000) dollars and at the same time named Edward Ball as his spokesman and vice-principal in the enterprise. The complaint specifically alleges that "it was

the avowed plan" of the duPont interests "to virtually control the State of Florida by a general infiltration areawise of the control of the financial, commercial, transportation and manufacturing institutions and resources of Florida."

The complaint further alleges that the initial cleavage between R. E. Crummer and Edward Ball occurred in the year 1929 as the result of the attempt of said Ball to induce the State of Florida to construct an extensive highway within the State to be known as the "Gulf Coast Highway" through and over wild, unimproved and unoccupied lands which the Ball-duPont interests had purchased, while at the same time R. E. Crummer was proposing a plan to the Legislature to assist counties and special road and bridge districts of Florida to meet their impending bond defaults; and despite Ball's open opposition the legislation sponsored by Crummer was enacted into law.

The complaint then specifically alleges that "from this point forward up to and including the time of the filing of this complaint, the defendant, Edward Ball, has continuously criticized the undertakings in Florida of all companies bearing the Crummer name."

The complaint next alleges that by 1938 economic recovery progressed to a point that the period of temporary refunding in Florida securities ended and permanent refinancing began. The complaint charges that from the inception of this latter program the "Ball-duPont" defendants and the "Leedy-Pierce" defendants became active participants in the bond market and competitors of plaintiff. This competition, keen as it may have been, continued without any serious consequences until 1941. In that year a new Governor took office in Florida in January and a new Legislature convened in April and shortly thereafter the troubles of R. E. Crummer & Company began.

The lower branch of the Legislature passed a resolution calling for an investigation of the activities of all bonding companies dealing in Florida taxing

units securities, but failed to provide any money for the activities of the committee or to authorize it to conduct hearings after the adjournment of the Legislature. Thereafter, on February 11, 1942 the Governor of the State of Florida entered an Executive Order authorizing the investigation, created a committee for the purpose and named as members of the committee the same persons who had been appointed by the Speaker of the House of Representatives to serve on the legislative committee. In addition, the Governor appointed Walter P. Fuller as his special representative to carry on the investigation. The committee was directed to make a report to the 1943 session of the Legislature, which it did.

The troubles of plaintiff, R. E. Crummer & Company, were not limited during this period to the activities of the investigating committee created by the Governor, for shortly after its creation the Post Office Department and the Securities and Exchange Commission started investigations into the activities of R. E. Crummer & Company, which resulted in two indictments being returned against said defendant and others on August 3, 1944, in the United States District Court for the District of Kansas, Second Division. These indictments substantially terminated the business activities of plaintiffs until they were dismissed on June 10, 1946.

### The Alleged Overt Acts

The complaint charges defendants with the commission of approximately forty overt acts in the execution of the illegal confederation, combination and conspiracy charged. The complaint names public authorities of the State and Federal governments as the only visible activity behind which plaintiffs claim the alleged overt acts were committed. These activities of public authorities behind which the defendants are alleged to have operated may be summarized as follows:

1. The legislative investigation authorized by the House of Representatives in May, 1941 and reactivated by Executive Order of the Governor of the State of Florida in 1942.

2. Investigations and hearing conducted in Tallahassee, Florida, in January, 1943 and January, 1944, by the Securities Commission of the State of Florida to determine whether to grant the plaintiff, The Crummer Company, a license to do business as a security dealer within the State.

3. Suits brought in 1942 and 1944 by public officials of the State of Florida for declaratory judgments to determine the validity of certain refunding contracts with one of the defendants.

4. The refusal in the latter part of 1941 by the State Board of Administration of the State of Florida to carry out certain contractual rights of the plaintiff, R. E. Crummer & Company, with Sarasota and Lee Counties, Florida.

5. The alleged investigation authorized by the Attorney General of the United States, which led to the return of two indictments against R. E. Crummer & Company and others, in the District Court of the United States, District of Kansas, Second Division, in August, 1944.

It appears on the face of the complaint that all the specified overt acts charged are alleged to have been committed prior to June 30, 1946. While the complaint alleges that the conspiracy continued in effect until the date of the filing of the suit in this case, if this is so, so far as the complaint alleges, it only consisted of a "wake" over the activities of plaintiffs after June 30, 1946.

In this case no State or Federal officer or employee is charged with any connection whatever with the alleged conspiracy except Walter P. Fuller, an investigator appointed by the Governor of the State of Florida to investigate into the activities of bond refinancing in the State, S. Wallace Shafer and Archie Cle-

ments, members of the House of Representatives of 1941 and of the Governor's investigating committee and Edward J. Mansfield, a Postal Inspector charged with having investigated into violations of the postal laws by plaintiffs, resulting in the indictments returned against the plaintiffs. These parties were all named defendants in this suit.

In addition, the complaint charges that Thomas B. Hart, Robert T. Wright, George Reutell, F. Joseph Butler and Alexander J. Brown, Jr., employees of the Securities and Exchange Commission during part or all of the years 1941 through 1946 also participated in the alleged conspiracy and in many of the overt acts charged. They were not named defendants because jurisdiction over them could not be acquired.

Plaintiffs allege (par. 43) that although the illegal confederation, combination and conspiracy and the unlawful acts and things occasioned and done by defendants in furtherance of their predetermined purposes and objectives extended over a period of years, beginning in or about the year 1941, the existence of said illegal confederation, combination and conspiracy, the names and identities of the natural and corporate persons participating therein, the predetermined purposes and objectives to be accomplished thereby, the scheme by which and through which the conspiratorial purposes and objectives were to be achieved, the commission of the overt acts and the perpetrators thereof were, for the first time, discovered by the plaintiffs, and then only partially, when in January, 1947 the defendants, Edward Ball, Roger L. Main, Howard S. Wheeler and others, testified before a subcommittee of the Committee on the Judiciary of the United States Senate, acting under authority of U. S. Senate Resolution 35, 79th Congress and subsequent extensions of the authority conferred by said resolution. It is the claim of plaintiffs that defendants had successfully concealed their conspiratorial purposes, overt acts and identities of the actors by contriving means by which the various unlawful infringements on plaintiffs' rights were either wholly concealed or were made to appear to be merely coincidental and not premeditated parts of the whole conspiracy. The complaint specifically alleges that the defendants acted "under color of purported public authority which was skillfully employed as the only visible instrumentality by which plaintiffs' business and property were set upon and destroyed."

When considered in connection with other allegations in the complaint these allegations fall far short of the particularity of statement required by Rule 9(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. A party seeking to avoid the bar of the statute on account of fraud must aver and show lack of knowledge and that he used diligence to discover it. The court, in some detail, has set out the allegations of the complaint preliminary to the allegations concerning the alleged overt acts and the charge of fraudulent concealment for the reason the whole complaint makes it crystal clear that plaintiffs knew all along that defendants were active competitors of plaintiffs and that the relationship between them was not entirely cordial and harmonious. And when plaintiffs' troubles began with State and Federal officials in 1941 they knew, or should have known, that the defendants, or at least some of them, would gladly aid the State and Federal officials in any way they could to further the investigations. It is clear to this court that plaintiffs knew all along, or should have known, that some of the defendants were active in aiding the authorities to make out the best cases they could against the plaintiffs in all the official matters in which action was taken.

Concealment of the activities of the defendants, or any of them, with the public authorities making the investigation is not enough. The complaint must charge and the evidence must show some trick or contrivance intended to exclude suspicion and prevent inquiry. When the indictments against these plaintiffs were dismissed on June 10, 1946 and

they were again free to resume business activities without embarrassment, they were also free to start an inquiry into the motivated causes, if any existed, culminating in the troubles they experienced at the hands of lawful authorities.

██ As stated above, the law is well settled on this subject that bare allegations of fraudulent concealment is but a conclusion of law which falls short of the particularity of statement required by Rule 9(b) of the Federal Rules of Civil Procedure. Mere concealment is not enough when dealing with the statute of limitations. One who seeks to toll the statute of limitations must explain due diligence could not have led to discovery and one who seeks to avoid the bar of the statute on account of fraudulent concealment must aver and show he used due diligence to detect it and if he had the means of discovery in his power he will be held to have known it. Wood v. Carpenter, 101 U.S. 135, 25 L.Ed. 807; Arkansas Natural Gas Co. v. Sartor; 5 Cir., 78 F.2d 924; Hickok Producing and Development Co. v. Texas Company, 128 F.2d 183; Phillips Petroleum Co. v. Johnson, 5 Cir., 155 F.2d 185; Suckow Borax Mines Consol. v. Borax Consol., 9 Cir., 185 F.2d 196; and Burnham Chemical Co. v. Borax Consol., 9 Cir., 170 F.2d 569.

██ Plaintiffs, while citing many cases, rely heavily upon Bailey v. Glover, 21 Wall. 342, 88 U.S. 342, 22 L.Ed. 636, and American Tobacco Co. v. People's Tobacco Co., 5 Cir., 204 F. 58, as being controlling upon the court in this case. There is no doubt about the doctrine announced by the courts in Bailey v. Glover and American Tobacco Co. v. People's Tobacco Co. being the law today. These cases, however, are not controlling here. This court held in its order of October 26, 1953 that the doctrine of fraudulent concealment applies in private civil anti-trust actions and is applicable in this case, if sufficiently alleged in the complaint. What the court now finds and holds is that the complaint not only fails to allege sufficient facts to make an issue on the question of fraudulent concealment, but that the complaint, when considered in its entirety, fully discloses that plaintiffs knew, or should have known, all along that defendants were active in aiding the State and Federal officials in every way they could in all matters being investigated that affected plaintiffs.

The court finds and holds that the allegations of the complaint in this case are, on the face of the complaint, insufficient to toll the statute of limitations and that the action is barred and the suit should be dismissed.

An appropriate order will be entered herein dismissing this cause of action on the ground that it is barred by the Florida three-year statute of limitations.