**NOERR MOTOR FREIGHT, INC., et al.,
Appellants in No. 12750,**

v.

**EASTERN RAILROAD PRESIDENTS
CONFERENCE et al., Appellants in
No. 12751.**

**Nos. 12750, 12751.**

United States Court of Appeals
Third Circuit.

Argued June 8, 1959.

Decided Dec. 10, 1959.

Biggs, Chief Judge, dissented.

Harold E. Kohn, Philadelphia, Pa.,
(Philip P. Kalodner, Aaron M. Fine,
Philadelphia, Pa., Dilworth, Paxson, Kal-
ish, Kohn & Dilks, Philadelphia, Pa., on
the brief), for plaintiffs.

Daniel Mungall, Jr., Philadelphia, Pa.
(Seth W. Watson, Jr., Philadelphia, Pa.,
on the brief), for Main Cent. R. Co.

Philip Price, Philadelphia, Pa. (Bal-
lard, Spahr, Andrews & Ingersoll, Phil-
adelphia, Pa., Hughes, Hubbard, Blair
& Reed, New York City, Barnes, Dechert,
Price, Myers & Rhoads, Harold B. Borne-
mann, Philadelphia, Pa., Dennis P. Dono-
van, New York City, Drinker, Biddle &
Reath, Philadelphia, Pa., Carl E. Glock,

Pittsburgh, Pa., James B. Anderson, Montgomery, McCracken, Walker & Rhoads, Morgan, Lewis & Bockius, Daniel Mungall, Jr., Cornelius C. O'Brien, Jr., Philadelphia, Pa., T. W. Pomeroy, Jr., Pittsburgh, Pa., Paul Maloney, Saul, Ewing, Remick & Saul, Philadelphia, Pa., on the brief), for defendants.

Before BIGGS, Chief Judge, and McLAUGHLIN and STALEY, Circuit Judges.

PER CURIAM.

In this antitrust action for an injunction and treble damages,[1] forty-one long distance trucking companies and their trade association, Pennsylvania Motor Truck Association, sued twenty-four major eastern railroads, Eastern Railroad Presidents Conference and Carl Byoir Associates, Inc. a New York corporation, the public relations agency for the Conference.

Plaintiffs charged in their complaint (filed April 30, 1953) inter alia, that in or about May, 1949, the defendant Railroads embarked upon an illegal conspiracy, in violation of the civil and criminal provisions of the antitrust laws of the United States, aimed at destroying the plaintiffs and those similarly situated as competitors in the field of the hauling of freight, and at carving out exclusive, monopolistic spheres of operation in the freight transportation business of the United States, so that the railroads would have a monopoly on freight hauling in interstate commerce; that the defendant Railroads worked for those ends through the defendant Conference; that the latter retained defendant Byoir as publicity agent to carry said conspiracy into effect; that thereafter the Conference, its committees, members thereof, the defendant Railroads, their presidents and trustees and other individual defendants and Byoir, with divers other persons unknown to plaintiffs, have acted in combination and concert to obtain the objectives of the conspiracy. The means used are detailed in the complaint; a continuing conspiracy to the date of the complaint is alleged; damage to each of the plaintiffs is asserted, irreparable, continuing injury stated and an injunction asked. Defendants denied the charges of the complaint. In 1956, after the case had been assigned a trial date, October 1, 1956, and while discovery procedures were pending, some of the Railroads and the Conference sought permission to and were allowed to file a counterclaim against the plaintiffs. This claimed that plaintiffs were engaged in an illegal conspiracy to obtain a monopoly of the long haul freight industry in the same part of the United States as set out in the complaint and to force the Railroads out of that part of the transportation business in that area.

The case went to trial before Judge Clary on October 1, 1956 and lasted almost four months. There were many witnesses and 968 exhibits. On October 10, 1957, the court in an exhaustive opinion (it covers 73 pages in 155 F.Supp. 768–841) found in favor of the plaintiffs against all the defendants on plaintiffs' cause of action and against the defendant counterclaimants and in favor of the plaintiffs on the counterclaim.

Soundly based on substantial evidence, the trial court found that the Railroads and Byoir, as contended, had conspired in unreasonable restraint of trade to injure the truckers in their competitive position in the long haul freight industry in the northeastern part of the United States; that their immediate purpose was to create public resentment to the truckers, not only in the minds of the general public but in the minds of those who utilized the services of the trucks and in such a manner as to interfere with business relations between shippers and truckers; that instead of meeting the truckers competition in the long haul freight field, the Railroads and Byoir combined to injure and/or destroy the truckers and thereby force the shippers to their detriment to continue to use the Railroads; that they adopted and car-

---

1. Sherman Act, 15 U.S.C.A. § 1 et seq.; Clayton Act, 15 U.S.C.A. § 15.

ried out a full program to obtain that objective; that serious private injury to the truckers was accomplished, definitely a loss of good will to the trucking industry and in some instances that loss of good will being extreme; that their actions destroyed to a large extent the public confidence which the truckers had fairly earned and which might have been increased in the light of the innumerable beneficial accomplishments of the truckers in long haul transportation.

The court found on overwhelming evidence that it was no series of individual conspiracies in the various states involved but one large ever-growing conspiracy as charged having as its goal to injure and/or destroy the long haul trucking industry and that the main means used to attain such end was primarily a campaign designed to destroy the good will of the truckers and to instigate and foster government restrictions by creating public hostility to the truckers, bringing this to the attention of the various legislatures, then proposing legislation crippling to the trucking industry and favored by the Railroads, all under the guise of public spirited organizations and with the defendants' interest concealed.[2]

The record shows the defendants' antitrust conspiracy completely established against all the defendants named in the decree.[3] It shows both legal and illegal methods to obtain the illegal objective of injuring and/or destroying the long haul trucking industry. It shows injury to

2. The third party apparatus employed by the defendants, while concealing their own adroit manipulation thereof, in seeking to procure legislative and executive action is contrary to public policy and illegal. Marshall v. Baltimore & O. Railroad Co., 1853, 16 How. 314, 335, 14 L. Ed. 953; Angle v. Chicago, St. Paul, M. & O. R. Co., 1893, 151 U.S. 1, 14 S.Ct. 240, 38 L.Ed. 55; Commissioner of Internal Revenue v. Textile Mills Securities Corp., 3 Cir., 1940, 117 F.2d 62, affirmed 1941, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249. Cf. United States v. Silliman, 3 Cir., 1948, 167 F.2d 607, certiorari denied 1948, 335 U.S. 825, 69 S.Ct. 48, 93 L.Ed. 379.

3. The attempt to influence legislation and executive action while rightly held by the trial court to be less important than the direct vilification of the long haul trucking industry was nevertheless properly found to be a vital element of the defendants' conspiracy to injure and/or destroy that group. Even assuming the brazen interference with legislation and executive action in this instance was lawful, its entire motivation was shown to emanate from the conspiracy charged. It was part of defendants' scheme to wreck their competitor, to monopolize that branch of commerce for themselves. As such it violated the Sherman Act. Giboney v. Empire Storage & Ice Co., 1949, 336 U.S. 490, 497–502, 69 S.Ct. 684, 93 L.Ed. 834; United States v. Krasnov, D.C. E.D.Pa.1956, 143 F.Supp. 184, affirmed 1957, 355 U.S. 5, 78 S.Ct. 34, 2 L.Ed. 2d 21; Atchison, Topeka & Santa Fe Railway Co. v. Aircoach Transport Association, 102 U.S.App.D.C. 355, 253 F. 2d 877, 887.

American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, urged below and here by the Railroads, has no real application to the facts before us. The later decisions of the Supreme Court in United States v. Sisal Sales Corporation, 1927, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042, and Steele v. Bulova Watch Co., 1952, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 clearly indicate that the Banana Company opinion is limited to the proposition that the Sherman Act cannot be invoked against persuading a foreign sovereign to act. Okefenokee Rural Electric Membership Corp. v. Florida Power & Light Co., 5 Cir., 1954, 214 F.2d 413, is the other decision stressed by the Railroads in the district court and on appeal. That too is hardly an authority for anything pertinent under the instant unescapable facts. There the complaint made no allegation that the conspiracy was directed to ruining a competitor in his business. The later case of Crummer Co. v. Du Pont, 5 Cir., 1955, 223 F.2d 238 and 5 Cir., 1958, 255 F.2d 425, certiorari denied 1958, 358 U.S. 884, 79 S.Ct. 119, 3 L. Ed.2d 113, leaves no doubt but that as of now in the Fifth Circuit Court of Appeals, a conspiracy to drive a competitor out of business is a violation of the Sherman Act even though, as in Crummer, its most important element was the obtainment of its objective by secretly moving under the guise and protection of the public interest and through the public authorities.

the plaintiffs and to the public. It justifies the injunctive relief against continuing illegal activities of the defendants. It justifies the compensatory damages (trebled by statute) allowed plaintiff Pennsylvania Motor Truck Association, together with costs and counsel fees. It justifies the holding of the district court that the other plaintiffs, by reason of the stipulation which is very clear and is part of the record, are only entitled to nominal damages. It justifies the dismissal of the counterclaim, which action is not disputed by the Railroads except in line with their argument that the counterclaim is similar in content to the plaintiffs' claim.

Though we think it plain from what we have said, it might be well to expressly note that the suggestion that the Railroads' entire activity, spearheaded by Byoir, was merely a perfectly legitimate public relations campaign for legislation is fanciful in view of the impressive documentation in the record of the finding of the trial court " * * * *that the entire campaign and its objectives did not constitute a mere appeal to the legislature; nor was it a large scale lobbying campaign. True, one phase of the activities was of a legislative nature—but a rather new approach to legislation, to say the least. The other phase, and the more important one of the campaign, was one of vilification designed to destroy the good will of the long-haul trucking industry. Hence, the Court has rejected the contention of the defendants that their combination was entirely legislative. I have further determined that the railroads were not acting as the guardian of the public welfare, as they have so earnestly asserted."* (Emphasis supplied.)

Judge Clary's opinion is soundly predicated on the facts and law of this litigation. We are in accord with it. The decree and orders of the district court of July 22, 1958 and July 31, 1958 will be affirmed.

---

1. Represented by Pennsylvania Motor Truck Association (PMTA).

BIGGS, Chief Judge (dissenting).

The case at bar merits the attention of the reviewing Court. The record demonstrates that no cognizable offense has been proved under Section 1 or Section 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and that therefore relief cannot be granted to the plaintiffs under Sections 4 and 16 of the Clayton Act. 15 U.S.C.A. §§ 15 and 26. Moreover, the reach of the decision of the court below is disastrous for it applies the Sherman Act to governmental restraints imposed by statutes enacted by state legislatures and to private activity in procuring such legislation. If the interpretation of the court below and of this court be correct the reach of the First Amendment which guarantees freedom of petition will be unduly limited and to an extent at least, destroyed. Rights guaranteed to the States and to the people by the Tenth Amendment will be endamaged. Heavy sanctions, criminal as well as civil, can be imposed on persons who seek the enactment of laws by Congress or by the legislatures of the States. I shall endeavor to deal first with what can perhaps be properly described as "conventional" antitrust law in relation to the case at bar and at a later point in this opinion will discuss the application of the constitutional guarantees referred to.

What the record proves is the following. Certain interstate trucking companies [1] were engaged in hot economic competition with twenty-four major eastern railroads [2] in the interstate transportation of long-haul freight. The Railroads and the Truckers as groups were avidly desirous of increasing their own respective interstate freight haulage and profits and decreasing those of the competing group. Both Railroads and Truckers hired public relations agencies to aid them. The ERPC engaged Byoir. PMTA engaged Allied Public Relations Associates. The methods employed by the public relations agencies of both the Railroads and the Truckers left much to

---

2. Represented by Eastern Railroad Presidents Conference (ERPC).

be desired in respect to moral consciousness. Sources of propaganda were concealed by both sides by the use of the so-called "third-party" technique.

Both Railroads and Truckers and their agencies desired to influence public opinion in order to increase their own good will and to damage that of each other and thereby to procure legislation favorable to themselves and unfavorable to the competing group.[3] There was no difference in substance between the methods employed by Byoir for the Railroads and those employed by Allied Public Relations Associates for the Truckers except that Byoir was more vigorous, more vocal, and more effective. It was a no-holds-barred fight by both sides. The methods employed might well cause justifiable fear to those concerned with the viability of our representative form of government.

### Conventional Principles of Law Hitherto Deemed Applicable to Section 1 and Section 2 of Sherman Act Suits.

As has been said, the action is based on Sections 1 and 2 of the Sherman Act.[4] It is necessary to discuss the applicability of both sections and it is more convenient to proceed first with a discussion of Section 2. The Truckers' case is deficient when viewed in the light of Section 2, the "Monopoly" section, of the Sherman Act. Section 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *." The offense of monopolizing means " * * * to combine or conspire to acquire or maintain the power to exclude competitors from any part of the trade or commerce among the several states or with foreign nations, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power."[5] American Tobacco Co. v. United States, 1946, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575. Since the Railroads have not effected a monopoly on long-haul freight traffic or destroyed the Truckers' business[6] only an attempt to monopolize or of a conspiracy to attempt to monopolize can be proved against them.[7] A necessary element

3. A typical example is supplied by Senate Bill No. 615, Session of 1951 of the General Assembly of Pennsylvania, referred to from time to time in the testimony as the "Big Truck Bill", caused to be introduced by the Truckers, which would have raised the permissible weight limits of heavy trucks from 45,000 to 60,000 pounds. The defendants procured the veto of this bill by Governor Fine. A somewhat similar bill, also proposed by the Truckers, was "Bill A-13" in the New Jersey Legislature. Similar legislation was also before the legislatures of New York and Ohio. I shall not detail the various bills in the various State legislatures involved. These are set out in full, with many allied matters, in the opinions of the court below. See 155 F. Supp. 768, and opinion on damages, 166 F.Supp. 163, 166.

4. It should be noted that neither the opinion of the court below, 155 F.Supp. 768, nor that of this court, pinpoints whether the action is sustained under Section 1 or Section 2 of the Sherman Act.

5. The complaint alleges a conspiracy to create a monopoly. See paragraphs 12, 13 and 14 of the complaint. I assume therefore that the action at bar was one brought under Section 2 of the Sherman Act but I make no point of any deficiency in pleading as will appear from this opinion in the discussion of the applicability of Section 1 of the Sherman Act, the "restraint of trade" section.

6. Proof in the record aside, the court below and this court are entitled to take judicial notice that the Railroads have not driven the Truckers out of business.

7. The circumstances are peculiarly unfitted for the maintenance of a Section 2 case. We do not have before us a situation where one corporation, or even a few corporations, attempt to eliminate all competition so that it, or they will be left with unbridled power over prices, output, and entry into the competitive field. An entire section of what may be called the "transportation industry" consisting of many railroads is accused of

of an attempt to monopolize is a specific intent to effect that result. United States v. Columbia Steel Co., 1948, 334 U.S. 495, 531–534, 68 S.Ct. 1107, 92 L.Ed. 1533.

This leads to the issue which is dispositive of the Section 2 phase of the instant case. Can an attempt to monopolize the transportation of long haul freight in the sense required by Section 2 be inferred from the evidence? The elements necessary to establish an attempt to monopolize in violation of Section 2 were set out in classic form in Swift & Co. v. United States, 1905, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518, and have remained unchanged. In the opinion last cited the Supreme Court said: "Intent is almost essential to such a combination, and is essential to such an attempt. Where acts are not sufficient in themselves to produce a result which the law seeks to prevent,—for instance, the monopoly,—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. Commonwealth v. Peaslee, 177 Mass. 267, 272, 59 N.E. 55. But when that intent and the consequent dangerous probability exist, this statute, like many others, and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." Thus it is clear that in addition to an intent to monopolize, the evidence must prove that the activities of defendants in a Section 2 case create a dangerous probability of monopoly. See again United States v. Columbia Steel Co., supra.

The court below found as a fact that vigorous efforts were made by the Railroads and Byoir to injure the Truckers' good will business-wise, to decrease the number of the Truckers' customers, to pass anti-trucking legislation and to increase trucking costs and to prevent the enactment of legislation which would decrease those costs. The proof is not sufficient in the instant case to sustain a Section 2 charge. There is no evidence in this record proving that the efforts of the Truckers or Byoir were liable to bring the long-haul trucking industry to an end. There is no showing that even the most optimistic of the Railroads or Byoir intended, expected, or even hoped, to destroy interstate trucking. The circumstances at bar do not traverse the limitations imposed by the Columbia Steel Co. decision. Moreover, there is no proof whatsoever of a "dangerous probability" that a monopoly could result as required by the Swift decision. Under the circumstances a cause of action based on Section 2 falls. If the judgment of the court below against the Railroads is to be sustained it must be under Section 1 of the Sherman Act.

But the Truckers have not proved a cause of action cognizable under Section 1 of the Sherman Act. Section 1 of the Sherman Act prohibits "Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States * * *." As was said in Northern Pac. R. Co. v. United States, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, "Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition". Mr. Justice Black went on to say that certain agreements or practices have such a pernicious effect on competition that they are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the busi-

trying to eliminate another section of the transportation industry, the Truckers, a situation that as far as research indicates has never previously resulted in successful antitrust litigation. Even if the Railroads had actually eliminated the Truckers' competition completely the Railroads' position would be far different than that of the successful monopolist since there still would be competition among the various railroads. Furthermore the interstate ground transportation industry is a regulated industry, with almost every phase of its activity controlled by the Interstate Commerce Commission.

ness excuse for their use". Mr. Justice Black then designates the kind of practices which the courts have deemed to be unlawful in and of themselves and cites the relevant cases.[8] The acts of the Railroads and Byoir were not proved to be such as to cause the case at bar to fall within the category of cases where the principle of unreasonableness is automatically applicable. The court below so found.[9] The issue then becomes: Did the combination or conspiracy here "unreasonably restrain competition"? The record fails to demonstrate that the Railroads and Byoir did so here.

Moreover, and quite aside from the foregoing, restraints which constitute violations of Section 1 are those which involve conspiracies of members of an industry to follow a mutually self-restricting course in the area of their own competence in order to obtain unlawful commercial advantages over customers or suppliers. The plan here, as proved, was to decrease the business of fellow members of the interstate transportation industry, the Truckers. Furthermore the essence of the campaign was not joint action for any one of the Railroads acting alone could have achieved the result which was attained. Any Railroad could have hired Byoir. If the law is to be changed in these important respects the revision should be effected expressly by the Supreme Court and not by this tribunal.[10]

But without regard to what I have termed "conventional" antitrust law and whether the suit is sought to be maintained under Section 1 or Section 2, or both sections, I am of the view that the provisions of the Sherman Act are not applicable here because of what is set out in the following three headings of this opinion.

Principles of Antitrust Law Applicable Under the Circumstances at Bar Where Legislative Action Was Invoked or Avoided.

The objectives of the Railroads, as found by the court below, are set out and discussed hereinafter under the heading "As to Damages". It is desirable to state again at this point that the principal objective of both Railroads and Truckers was to achieve legislation which would increase their own profits from interstate freight haulage and decrease those of the competing group. The actions of the Railroads and Byoir in this respect were described by the court below as the "fomenting of governmental restriction * * * increasing the cost of operation and/or preventing the carrying of greater loads" by the Truckers, and was held to be an unreasonable restriction of competition.[11] The public interest must be deemed, of course, to be involved here as it is in every antitrust suit but there is also a potent public interest in the right of the individual to act in support of or in opposition to legislation. Does the public interest in this latter right rise superior to the public interest sought to be preserved by the antitrust laws? Does the

8. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 210, 60 S.Ct. 811, 84 L.Ed. 1129, price-fixing; United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, affirmed 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, division of markets; Fashion Originators' Guild of America v. Federal Trade Comm., 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L. Ed. 949, group boycotts; International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, tying arrangements.

9. See 155 F.Supp. at page 816.

10. See e. g. United States v. Patten, 1913, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333,

market cornering; United States v. Addyston Pipe & Steel Co., note 8, supra; Fashion Originators' Guild of America v. Federal Trade Comm., note 8, supra; United States v. General Electric Co., D.C.D.N.J.1949, 82 F.Supp. 753, market division; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S. Ct. 811, 84 L.Ed. 1129, price-fixing, output restrictions; United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S. Ct. 915, 92 L.Ed. 1260, price-fixing and United States v. Frankfort Distilleries, 1945, 324 U.S. 293, 65 S.Ct. 661, 89 L. Ed. 951, resale price maintenance.

11. See 155 F.Supp. at page 833.

Sherman Act apply to legislative restraints or to private activity in support of such restraints? I think the decisions demonstrate that the Sherman Act cannot be employed to make such private activities illegal and that whether successful or unsuccessful they do not constitute unreasonable restraints on interstate commerce.

In Olsen v. Smith, 1904, 195 U.S. 332, 344–345, 25 S.Ct. 52, 49 L.Ed. 224, where the restraint was imposed by a Texas statute, it was held that the intent of Congress in enacting the Sherman Act was to prevent private, not governmental, actions in restraint of competition.[12] In American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 358, 29 S.Ct. 511, 513, 53 L.Ed. 826, the Supreme Court dealt with a very similar issue, Costa Rica, by what was in effect law, having confiscated property of one corporation at the instigation of a trade rival. Mr. Justice Holmes said that "The fundamental reason why persuading a sovereign power to do this or that cannot be a tort * * * is that it is a contradiction in terms to say that, within its jurisdiction, it is unlawful to persuade a sovereign power to bring about a result that it declares by its conduct to be desirable and proper. * * * It makes the persuasion lawful by its own act. The very meaning of sovereignty is that the decree of the sovereign makes law."

In Parker v. Brown, 1943, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315, California had passed a proration statute which restricted competition among raisin growers and fixed prices. Mr. Chief Justice Stone stated: "The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state."

There is no doubt that a State of the United States in the exercise of its police power may legislate for the health, safety or welfare of its people or that a State may enact legislation affecting interstate commerce if the law passed does not "impede substantially the free flow of commerce from state to state." Southern Pacific Co. v. State of Arizona, 1945, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915. An exercise of State police power by the enactment of legislation by the State for a proper objective is constitutionally permissible. In Stephenson v. Binford, 1932, 287 U.S. 251, 276, 53 S.Ct. 181, 189, 77 L.Ed. 288, the Supreme Court stated: "We need not consider whether the [State] act [regulating carriage by truck] in some other aspect would be good or bad. It is enough to support its validity that, plainly, one of its aims is to conserve the highways. If the Legislature had other or additional purposes, which, considered apart, it had no constitutional power to make effective, that would not have the result of making the act invalid." Cf. Sproles v. Binford, 1932, 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167. One of the admitted purposes of the legislation with which we are here concerned was the preservation of State highways and another was the raising of State revenues. It appears clearly that the States involved in the instant case acted within their constitutional power, just as Governor Fine acted within his constitutional power when as Chief Executive of Pennsylvania he vetoed Senate Bill No. 615.[13] To hold otherwise would be to nullify substantially State legislative power.

It is asserted that United States v. Sisal Sales Corp., 1927, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042, and Steele v. Bulova Watch Co., 1952, 344 U.S. 280, 73

---

12. Cf. Mackay Radio & Telegraph Co. v. F.C.C., 1938, 68 App.D.C. 336, 97 F.2d 641, 643.

13. Cf. Foster-Fountain Packing Co. v. Haydel, 1928, 278 U.S. 1, 10–11, 49 S. Ct. 1, 73 L.Ed. 147, wherein the Supreme Court, granting a temporary injunction, held that the purpose of the State act procured by private activity, allegedly to conserve hulls and heads of unprocessed shrimp, was a feigned purpose and therefore was not a valid exercise of State police power.

S.Ct. 252, 97 L.Ed. 252, in effect overruled the American Banana Co. decision. In the Steele case the action was one brought under the Lanham Trade-Mark Act of 1946, 15 U.S.C.A. § 1051 et seq., and was not based on the antitrust laws but more importantly an act of a sovereign was not involved. In the Sisal case it was held that the Sherman Act did not apply to what the defendants did in Mexico and Yucatan: i. e., procure discriminatory legislation there. Mr. Justice McReynolds stated, 274 U.S. at page 276, 47 S.Ct. at page 594, "True, the conspirators were aided by discriminating legislation, but by their own deliberate acts, here and elsewhere, they brought about forbidden results within the United States. They are within the jurisdiction of our courts and may be punished for offenses against our laws." The American Banana Co. decision expressly was not overruled. I can find no Supreme Court decision, unless it be Foster-Fountain Packing Co. v. Haydel, 1928, 278 U.S. 1, 10–11, 49 S.Ct. 1, 73 L.Ed. 147, note 13, supra, which indicates a holding contrary to that of the American Banana Co. decision. The Foster-Fountain Packing Co. case seems distinguishable on the ground appearing in the note cited. But in any event in United States v. Rock Royal Co-op., 1939, 307 U.S. 533, 560, 59 S.Ct. 993, 1006, 83 L.Ed. 1446, the defendants attempted to prevent enforcement of a minimum Price Order [14] made by the Secretary of Agriculture on the ground that their competitors had engaged in a conspiracy to monopolize in violation of the Sherman Act by securing the drafting, adoption, and acceptance of the order. Mr. Justice Reed stated: "If ulterior motives of corporate aggrandizement stimulated their activities, their efforts were not thereby rendered unlawful. If the Act and Order are otherwise valid, the fact that their effect would be to give cooperatives a monopoly of the market would not violate the Sherman Act or justify the refusal of the injunction."

The facts in Okefenokee Rural Electric Membership Corp. v. Florida Power & Light Co., 5 Cir., 1954, 214 F.2d 413, 418, present an interesting analogy to those at bar and are very similar, save only that legislative action was not involved. It was alleged, however, that the State Road Department of Florida acting as a result of a conspiracy in violation of the Sherman Act between Florida Power and Light Company and others, prevented the Okefenokee Rural Electric Membership Corporation from making use of the only feasible route for an electric line along a public highway. It was alleged in the complaint that the defendants had been guilty of a "smear campaign", had made false arguments and had conducted dishonest activities as a result of which the State Road Department refused to grant the permit for the power line. Treating the facts alleged in the complaint as true, the Court of Appeals, in dismissing the suit, stated: "As so forcibly illustrated in Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183, 'Injury implies violation of a legal right.' The plaintiff had no legal right to use the state highway without a permit from the State Road Department, nor the county roads without permission of the Board of County Commissioners, and those authorities have decided against the plaintiff. So long as their decisions stand the plaintiff has not been legally injured, notwithstanding it may have been irreparably damaged." Implicit in this ruling is the legal conclusion that liability under the Sherman Act cannot be sustained by virtue of official action of a State agency however inspired by the acts of individuals.

I conclude (1) that the Sherman Act was not intended by Congress to be applicable to governmental restraints by way of legislation whether or not induced by private activity and (2) that private activities such as those conducted by the Railroads and Byoir under the circumstances presented here cannot be deemed

---

14. Order No. 27, under the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U.S.C.A. § 601 et seq.

to constitute unreasonable restraints or monopoly under the Act.[15]

### The Constitutional Issue.

If the reasoning of this opinion as expressed thus far be erroneous, it is necessary to discuss the constitutional questions which are posed by the circumstances and the decision at bar. As I read the opinion of the court below the constitutional protection asserted by the defendants was rejected on the ground that by resorting to a campaign of defamation the Railroads and Byoir invalidated the guarantees of the First Amendment.[16] The majority opinion seems to take a similar view. But I had not hitherto imagined that a constitutional guarantee could be avoided because of the bad conduct of the individual asserting the constitutional right. I do not believe so now. It might be argued, of course, that a determination that a restraint is unreasonable obviates constitutional guarantees but to state this argument demonstrates its invalidity. Cf. United States v. Columbia Steel Co., supra, 334 U.S. at page 522, 68 S.Ct. at page 1121. The vast importance of the right to petition, usually exercised by joint action, was set out by Mr. Justice Brandeis in his dissenting opinion in Gilbert v. State of Minnesota, 1920, 254 U.S. 325, 337–338, 41 S.Ct. 125, 129, 65 L.Ed.

287, as follows: "The right [to petition] * * * necessarily includes the right * * * to endeavor to make [one's] * * * own opinion concerning laws existing or contemplated prevail * * *. Full and free exercise of this right by the citizen is ordinarily also his duty; for its exercise is more important to the Nation than it is to himself. Like the course of the heavenly bodies, harmony in national life is a resultant of the struggle between contending forces. In frank expression of conflicting opinion lies the greatest promise of wisdom in governmental action; and in suppression lies ordinarily the greatest peril." Mr. Justice Brandeis' view in the Gilbert case became the law in Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. The First Amendment protects "secular" causes as well as "religious or political ones". Thomas v. Collins, 1945, 323 U.S. 516, 530–531, 65 S. Ct. 315, 323, 89 L.Ed. 430. A proposal to tax trucks stands upon the same ground as a religious speech or an unpopular political idea. The expression of "bloc sentiment" is an integral part of our legislative process. United States v. C. I. O., 1948, 335 U.S. 106, 143–144, 68 S.Ct. 1349, 92 L.Ed. 1849. There can be no question that the "idea" that trucks should or should not be taxed by the States has "social importance". Roth v.

---

15. Parenthetically, the court below reached, to me at least, the unusual result that the counterclaims asserted by the Railroads against the Truckers could not be maintained though the counterclaims allege acts of substantially the same character and nature as those of the Railroads and Byoir upon which judgment here is based. It is true that the Railroads conceded that the counterclaims are without merit. This concession was, I think, a necessary one. My view is based on the conclusion expressed in this opinion that the Truckers have not proved a cause of action under the Sherman Act. But the court below held that the Truckers' attempts at favorable legislation were permissible because they were attempting to procure laws that would better their competitive positions in relation to the Railroads. The court explains that the legislation sought would

have permitted the Truckers to enter fields previously closed to them and that therefore no violation of the antitrust laws was involved. But business gained by interstate truckers of necessity would be at the expense of interstate railroads. Moreover the position of the court below in respect to the counterclaims not stating a valid and proved cause of action overlooks the "good will theory" advanced by the court itself as the basis for its judgment. That there were attacks made by the Truckers on the good will of the Railroads is indubitable and the court below so found. See 155 F. Supp. at page 803. The distinction attempted to be made by the court is too subtle for me to grasp. It seems to be based on the theory that under the Sherman Act what is one competitor's meat may be another competitor's poison.

16. See 155 F.Supp. at pages 826–829.

United States, 1957, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

If persons are to be prohibited access to legislators because their utterances may be offensive to personal taste or morals we have moved far away from the Framers' conception of our republican form of government. The concept of lack of access by the people to a legislature is in its essence totalitarian. If material contrary to good morals, such as obscene matter, is placed by an individual or a group in unenlightened self interest before a State legislature it is, of course, permissible for the State to punish the projectors of such material by criminal or civil sanctions. But the imposition of such sanctions assuredly is not the function of the antitrust laws of the United States. To say that an individual legislator may be over-persuaded or wrongly convinced as to how he should vote is to state a commonplace but to deprive an individual of the right to petition under the guise of protecting private companies from restraint of trade or monopolistic practices is to say far too much and to say it badly. To whom may a person go to attempt to create or change the laws under which he lives if not to his Senators or Representatives, State or National? True, ills may inhere in this democratic process. The legislature may be propagandized by material from a tainted source but this is an abuse which is curable as Congress has cured it.[17] If persons are to be deprived of the right to petition because that right has been subject to abuse, liberty visibly will take flight.

I think that every thoughtful person will agree that the legislative processes cannot be conducted successfully and should not be conducted at all unless members of the public and all interested groups are allowed free access to legislators and legislatures in respect to legislation, pending or proposed. The application of the Sherman Act to limit the free expression of ideas by the public and interested groups, the right to petition, in order to give information, whether pertinent or impertinent, to their legislators and legislatures, would foil the legislative processes which consist in a large part of the balancing of conflicting interests and influences. In this field limitation is the equivalent of prohibition for if persons exercising their right to petition are to be subject to prosecution under the Sherman Act or to damages in civil suits under the Clayton Act, or go in fear of such prosecution or such suits, these persons will not exercise the right to petition and a fundamental constitutional right will be limited or destroyed. Sources of information now open to legislators as to pertinent conflicting interests will be choked-off or obliterated. The scope of the Sherman Act has been greatly enlarged in recent years and it is indeed a flexible statute but I cannot conceive that Congress intended it to be applied to limit or prohibit free access to legislatures or to the inducing of legislative action by private activity.

Moreover, in the instant case the exercise of State police or taxing power is a most delicate area in the fine balance which must be preserved between the States and the National Government. The enactment of legislation in the two fields designated is peculiarly a concern of the States and the enactment of such laws by the legislatures is the last sanctuary of States' rights. Here another provision of the Constitution comes into play. The Tenth Amendment provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are re-

---

17. It should be observed that the court below effected legislation for it requires the Railroads and Byoir not to publicize material relating to the Truckers "without disclosing their [own] participation". See paragraph "IV–(6)" of the final decree. I would conclude that this alone would require modification of the form of the injunction entered by the court below and approved by this court. Cf. N.A. A.C.P. v. State of Alabama, 1958, 357 U.S. 449, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488, in which the Supreme Court interdicted the prohibition of "privacy in group association".

served to the States respectively, or to the people." True, State police power has been curbed in the past by Congress by way of the Civil Rights Acts and State taxation has been limited by Congress where it has been deemed to trench on interstate commerce. And see again the quotation from Mr. Chief Justice Stone's opinion in Parker v. Brown, supra, 317 U.S. at page 351, 63 S.Ct. at page 313, where California had passed a proration statute which restricted competition among growers of raisins and also fixed prices. The principle enunciated is central to the Tenth Amendment for one must always ask oneself, as indicated above, how a State legislature could legislate effectively without information or petitions from those affected by legislation? The argument made by the Truckers in substance is that State action is not being affected but only nefarious conduct by those who induced State action is being curbed. It would seem that action by the State under the circumstances at bar must surely cauterize action by individuals. But if the great liberties guaranteed by the Constitution must be exercised reasonably, surely the circumstances presented here do not warrant limitation of the right to petition by the Sherman Act. I believe that Congress did not intend or even contemplate such a result.

## As to Damages.

The court below, as I grasp the contents of its opinion, has concluded that because the Railroads and Byoir embarked on a "Campaign of Vilification" against the Truckers legal damage resulted to them in the form of loss of "good will".[18] The court divided "good will" into two categories: first, good will of the Truckers in respect to their customers, injury by way of loss of business, and, second, loss of the good will of the public, the injury being defined in terms of disability "to avoid the imposition of crippling burdens and restrictions".[19] By stipulation it was agreed by the parties that the only damages claimed by the Truckers were those resulting from gubernatorial veto of certain legislation.[20] Single damages, subsequently trebled were awarded to PMTA. These were assessed on the basis principally of the money, $217,358, spent by PMTA, through Allied Public Relations Associ-

18. The court below stated: " * * * [A] real private injury to the truckers was accomplished. There was definitely a loss of good will to the trucking industry and in some instances that loss of good will was extreme." 155 F.Supp. at page 810 ("Summary").

19. The court stated: "[T]he use of the term 'good will' * * * relates not only to the direct damage done to the truckers, i. e., the refusal of truck users, because of the campaign, to avail themselves of that form of transportation (loss of business), but refers also to the more subtle type of injury done the entire trucking industry by discrediting it in the eyes of the general public, the 99% users of the highways, and eliminating the likelihood of public appreciation of the trucking industry as such or sympathy with the truckers' position which would be fundamental in gaining general public support to avoid the imposition of crippling burdens and restrictions." 155 F.Supp. at pages 810–811 ("Summary").

20. Section 3 of the Stipulation is as follows: "The only damages claimed by the plaintiffs (except plaintiff Pennsylvania Motor Truck Association) are those that each of them may have suffered because of its inability to carry more than the weight limits fixed by the laws of Pennsylvania prior to the change in the law in 1955."

The court took the position that the section of the stipulation quoted limited the money value of the Truckers' claims but not the nature of their claims. This was an erroneous interpretation of the stipulation. The Truckers called to testify conceded that their respective businesses had been harmed only by the legislative action or inaction that the Railroads and Byoir had effected. At pretrial conference it was stipulated that the Truckers who had not testified as to this issue would give similar evidence. Following this agreement the stipulation set out in Section 3, supra, was entered into. The distinction made by the court between the nature of the damage and the scope of the damage money-wise is invalid and also does violence to the intent of the parties.

ates, for "defensive measures", measures employed by PMTA to aid the Truckers, including the prosecution of the suit at bar. The monies which PMTA spent were expended for the very purposes for which they were contributed by the Truckers to PMTA.[21] It appears therefore that these expenditures made by PMTA were in reality paid for by the Truckers and that PMTA was a mere agent or conduit for the sums expended. I therefore can perceive no basis for the reimbursement of these sums to PMTA by way of allowance of damages to PMTA.

Moreover, the court below, while expressly refusing to allow damages to the Truckers because of the successful efforts of the Railroads and Byoir in defeating legislation sought by the Truckers, nonetheless allowed each of the Truckers nominal damages of six cents, trebled, eighteen cents, because of the Railroads' and Byoir's bad conduct. Since the court below held that no legally cognizable damages could ensue from acts entirely governmental[22] no legal foundation to support these nominal awards appears.

A substantial counsel fee was also allowed to counsel for the PMTA. This award also must fall if the judgment is reversed as I believe it must be.

I am also of the opinion that the injunctive relief granted under Section 16 of the Clayton Act is without justification. My conclusion in this regard is not based on any alleged abuse of legal discretion by the court below. It rests on the broad ground that no facts were proved which, under the antitrust laws, could justify the injunctive relief granted.

In conclusion, on the issue of damages, it is desirable, although perhaps not necessary, to comment briefly on the approach of the court below to loss of "good will" as elements of damage. If damages are to be recovered under Section 1 (or for that matter, under Section 2) of the Sherman Act in conjunction with Section 4 of the Clayton Act, there must be proof of damage. As to the loss of good will by the Truckers, businesswise in respect to their customers as defined by the court below, quoted in note 19 supra, it is clear there was no showing of any loss of business by any individual Trucker. None of the Truckers had or could have a legally protected interest in the good will of the trucking industry as a whole. Cognizable injury under the Sherman Act must be to some "business or property", i. e., a *violation of some property right or business which is recognized by the law*.[23] The court below took the position that the trucking industry is a legal entity possessing a cognizable interest in a kind of general good will belonging jointly to all Truckers in the suing group. But the suit at bar is a private antitrust suit. No joint right whatsoever is involved and each Trucker must maintain and vindicate his own separate and individual right.[24]

**21.** See *opinion on damages.* 166 F.Supp. at pages 166–168. As has been indicated PMTA is a Truckers' service organization. There is nothing in the record which would support its right to maintain a class suit, real or "spurious", on behalf of the Truckers. No satisfactory theory appears under which PMTA can be held to be entitled to maintain a suit in a representative capacity. See Rule 23, Fed.R.Civ.Proc., 28 U.S.C. Cf. United States v. Association of American Railroads, D.C.N.D.Neb.1945, 4 F.R.D. 510, 516.

**22.** See 155 F.Supp. at pages 834–835.

**23.** See Harrison v. Paramount Pictures, D.C.E.D.Pa.1953, 115 F.Supp. 312, 316, 317, affirmed per curiam on the opinion below 3 Cir., 1954, 211 F.2d 405; Melrose Realty Co. v. Loew's, Inc., 3 Cir., 1956, 234 F.2d 518, certiorari denied 1956, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed. 2d 85.

**24.** See Hess v. Anderson, Clayton & Co., D.C.S.D.Cal.1957, 20 F.R.D. 466; Weeks v. Bareco Oil Co., 7 Cir., 1941, 125 F. 2d 84; Kainz v. Anheuser-Busch, Inc., 7 Cir., 1952, 194 F.2d 737; Bascom Launder Corp. v. Telecoin Corp., D.C. S.D.N.Y.1950, 9 F.R.D. 677; and Farmers Co-op. Oil Co. v. Socony-Vacuum Oil Co., 8 Cir., 1942, 133 F.2d 101.

There can be no good will in gross. There is no evidence that any of the Truckers individually suffered or was threatened with any injury to his good name or to his business reputation. This element of damage attempted to be proved by the Truckers was shown to be completely lacking in factual foundation.

For the reasons stated I must dissent. I would reverse the judgment of the court below save only as to that portion of it which denies relief under the counterclaims.