### OKEFENOKEE RURAL ELECTRIC MEMBERSHIP CORP.
### v.
### FLORIDA POWER & LIGHT CO. et al.
### No. 14875.

United States Court of Appeals
Fifth Circuit.

July 9, 1954.

E. Kontz Bennett, Waycross, Ga., Chester Bedell, Jacksonville, Fla., J. Edwin Gay, Jacksonville, Fla., Bennett, Pedrick & Bennett, Waycross, Ga., Bedell & Bedell, Jacksonville, Fla., of counsel, for appellant.

Guy W. Botts, William M. Madison, City Atty., Jacksonville, Fla., Will M. Preston, Miami, Fla., Fleming, Jones, Scott & Botts, Jacksonville, Fla., Anderson, Scott, McCarthy & Preston, Miami, Fla., of counsel, for appellees.

Before HUTCHESON, Chief Judge, RIVES, Circuit Judge, and DAWKINS, District Judge.

RIVES, Circuit Judge.

The appellant, Okefenokee Rural Electric Membership Corporation, sued the appellees, Florida Power and Light Company, City of Jacksonville and J. D. Kennedy, the City's Commissioner of Utilities, for treble damages and for an injunction in an action based upon the Sherman and Clayton Anti-Trust Acts.[1] The district judge granted defendants' several motions to dismiss and dismissed the action "without leave to the plaintiff to amend". This appeal is from the final judgment of dismissal and involves the single question of whether the complaint states a claim upon which relief can be granted.

According to the averments of the complaint, which must be considered as true in considering its dismissal, the following state of facts is disclosed.

Okefenokee finances its operations under the Rural Electrification Act, 7 U.S.C.A. § 901 et seq. Under that Act, loans are limited to the financing of lines or systems for the purpose of furnishing electric energy to persons in "rural areas" which are defined so as to exclude any city or village having a population in excess of fifteen hundred inhabitants. 7 U.S.C.A. §§ 904, 913.

Okefenokee purchases its power wholesale in the State of Georgia from Georgia Power and Light Company and Georgia Power Company. It redistrib-

1. See particularly 15 U.S.C.A. §§ 1, 2, 15 and 26.

utes that power at retail in six counties in Georgia and, for more than twelve years has also served rural users in Baker, Duval and Nassau Counties in the State of Florida. The power so redistributed in Florida is purchased at wholesale in Georgia and carried through Okefenokee's own lines into the Florida areas of distribution.

Florida Power and Light Company operates electric generating and distribution lines in approximately one-half of the area of the State of Florida, including Duval and Nassau Counties.

The City of Jacksonville engages in furnishing electricity in territory beyond its territorial limits under a non-exclusive franchise, as well as in furnishing electricity within its limits.

The individual defendant, J. D. Kennedy, is Commissioner for Utilities of the City of Jacksonville.

The Yellow Bluff area in northeast Duval County has been without any electric service, the defendant City having refused to furnish such service, or having demanded the payment of from $1,000.00 to $1,500.00 per citizen to cover the cost of running electric lines to them, whereas service is extended by REA on an area basis at a cost of a membership of $5.00 per member. At the request of approximately 150 rural users, Okefenokee made a survey of the Yellow Bluff area, took applications for service and otherwise complied with conditions necessary to obtain a loan from REA to build a line to serve the Yellow Bluff area. This project was known as "K" project.

In connection with "K" project, Okefenokee arranged also to finance the construction of a line sufficiently heavy to carry additional power for better servicing of the Callahan and Dinsmore areas of Nassau and Duval Counties. During the twelve years in which Okefenokee has served those areas, there have been constantly increasing demands by Okefenokee member-users due to the increased use of modern appliances, such as refrigerators, washing machines, water pumps, television sets, etc.

Okefenokee's plan for servicing the "K" project and supplying additional power for servicing the Callahan and Dinsmore areas contemplated the construction of a power line from Kingsland, Georgia, along Federal Highway No. 17 to a point where that highway connects with Yellow Bluff Road. From this point, which is more than eight miles north of the Jacksonville city limits, one line would run easterly into the Yellow Bluff section for servicing "K" project; another line would be run in a westerly direction to connect with the lines already servicing the Callahan and Dinsmore areas.

The power so obtained in Kingsland, Georgia, would be obtained from the Georgia Power Company, which has a "practically unlimited" supply of "hydro and steam generated power" and which it can supply "more cheaply" than Okefenokee's other supplier of power, Georgia Power and Light Company, whose power is "diesel generated" and whose supply is limited.

Federal Highway 17 is the only feasible route, from an engineering and economic standpoint, upon which the new line from Kingsland can be built, due to the peculiar geography and topography of the marshy coastal area through which the line must pass.

Florida Power and the City have an illegal territory agreement whereby Florida Power is given exclusive rights in Nassau County north of the Nassau River, and whereby the City is given exclusive rights in Duval County, except those parts already being served by Florida Power.

Florida Power and the City, for the purpose of excluding Okefenokee from the area covered by the illegal territory agreement and for the purpose of destroying Okefenokee's investment in servicing the Callahan and Dinsmore areas, formed a conspiracy to place a "road block" along Federal Highway 17 where Okefenokee expected to run its new line, knowing that if passage along this highway was blocked it would be impossible, from an economic and engineer-

ing standpoint, for Okefenokee to erect its line through the marshes, river bottoms and waste lands.

Defendants have been and now are engaged in an unlawful combination and conspiracy to monopolize and exercise exclusive control over the territory in Nassau and Duval Counties in unreasonable restraint and monopolization of interstate trade and commerce, in violation of the Sherman and Clayton Acts, the detailed facts including the following:

On January 25, 1952, Okefenokee staked its proposed line along Highway 17 from St. Mary's River south to Yellow Bluff Road and on February 26, 1952, applied to the Florida State Road Department for permission to construct its power line along that route.

While Okefenokee was waiting for permission from the State Road Department to construct its line along Highway 17, the City and Florida Power proceeded to build a "spite line" along the highway "on the exact location which had been previously staked by Okefenokee." This was accomplished by Florida Power's building a line southerly to the north bank of Nassau River, where it was "dead-ended" and by the City's building a line to the south bank of Nassau River. This spite line or road block was constructed "for the sole purpose of taking the position that a power line was already along said highway" in opposition to Okefenokee's application for a permit; the only customers who could be served by Florida Power's line were two persons living at the Nassau River bridge; the only wire placed on the City's poles was a "neutral strand."

In pursuance of the conspiracy, the City made a false argument before the State Road Department that a line had already been extended along Highway 17 in order to furnish service to rural users, and that no new line should be built, well knowing that the line constructed by the City was built for spite purposes only and without any intention of serving customers in the Yellow Bluff area.

As a result of the building of the spite lines and the false arguments based thereon, the State Road Department denied a permit to Okefenokee to build its line along Highway 17.

As part of the conspiracy, the defendant Kennedy carried on a smear campaign in an effort to discredit Okefenokee. At Kennedy's direction, one of his engineers requested the County Commissioners of Duval County to establish regulations "which would prevent a full-scale encroachment of the Rural Electrification Co-operative's power lines into the local utility's territory", and "if legally permissible, to prohibit any other company from paralleling municipal installation." In that connection, the City's engineer stated that "the Municipal utility officials expect the REA to 'come right down Main Street Road and begin competition with the City's electric department'," well knowing that Okefenokee could not operate in the Jacksonville area. These requests and statements were publicized in the local press.

As a result of the City's smear campaign, the County Commissioners of Duval County passed discriminatory regulations applicable only to REA co-operatives and so designed as to prohibit Okefenokee from operating in Duval County.

As a result of defendants' unlawful activities, Okefenokee's investment in "K" project has been rendered worthless and of no value; it has been obliged to attempt to service its new members in the Yellow Bluff area by a portable power plant at an operating cost substantially in excess of the cost of the power it had expected to purchase from Georgia Power Company, resulting in an operating loss and, unless defendants are restrained from continuing their illegal agreement and conspiracy, Okefenokee will be obliged to abandon "K" project.

As a result of Okefenokee's inability to increase the power being supplied in the Callahan and Dinsmore areas sufficiently to adequately serve its users there, its en-

tire investment in those areas is likely to dry up and become worthless.

The complaint prays for the assessment of treble damages and for a permanent injunction dissolving the conspiracy and restraining the defendants from engaging in any activity to prevent Okefenokee from exercising its rights in Nassau and Duval Counties, Florida.

The district court granted the motions to dismiss and dismissed the cause "without leave to the plaintiff to amend." [2]

The appellant vigorously, and with much show of authority, attacks each of the grounds upon which the district court relied, and also the grounds which the district court did not consider but which are again urged by appellees in brief, and appellant further insists that, laying aside its prayer for damages, the complaint is certainly sufficient as a predicate for injunctive relief. As dispositive of this appeal, however, we do not think that it is necessary to consider grounds supporting the district court's decision, other than the one which we have numbered 4 in the summary in footnote 2, supra, and with which we are in substantial agreement.

■■ As a complaint for the recovery of damages under 15 U.S.C.A. § 15, it is of course essential that a legal injury be averred as a prerequisite to the recovery of "threefold the damages by him sustained". As a complaint for injunctive relief, it is essential that the averments disclose "a dangerous probability that such injury will happen". Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n, 274 U.S. 37, 54, 47 S.Ct. 522, 527, 71 L.Ed. 916.

The complaint avers,

"That Federal Highway 17 is the only feasible route from an engineering and economic standpoint along which said line can be built because of the peculiar geography and topography of the area through which

2. The grounds of the district court's decision, stated in a memorandum, may be summarized as follows:

1. Although "the power source of the plaintiff is located in Georgia and the transmission lines from that source run continuously into Florida," "I am not persuaded that when the sale and delivery of electric power to the ultimate consumer takes place in Florida, the transaction is one of interstate commerce."

2. "* * * the trade and commerce, which the Complaint alleges the defendants attempted to monopolize, is confined wholly to the State of Florida" and "I therefore find that no monopoly condemned by the Sherman and Clayton Acts is charged against the defendants in this case."

3. Even "if interstate commerce is involved, and if the alleged conspiracy of the defendants does in fact effect some restraint on interstate commerce, such restraint is insubstantial and indirect."

4. The injury complained of by Okefenokee being the refusal of the State Road Department to grant it a permit to run its line down a state highway, and the adoption by the Duval County Commissioners of regulations invading its legal rights, the actions of those administrative bodies could not afford Okefenokee any right of action under the Anti-Trust Acts, since the orders complained of were the sole responsibility of the administrative boards, and the subject matter was exclusively within their jurisdiction; the validity of those orders could be attacked only in an action of mandamus or other such remedy in the state court and may not be collaterally attacked in this proceeding.

5. Since all acts attributed to the individual Kennedy are alleged to have been done in his official capacity, and his acts are not shown to have been beyond the scope of his authority, he could not be personally liable even if the City were liable.

6. "The defendants urged various other points in support of their Motions to Dismiss, including the argument that sale and distribution of electricity is a natural monopoly not intended to be controlled by the Anti-Trust Laws, that the City of Jacksonville cannot be sued as a defendant under the Sherman Anti-Trust Act, that as a pleading, the Complaint fails to contain the essential ingredients necessary to charge a conspiracy in restraint of trade or a monopoly, and that the City of Jacksonville cannot be a party to a conspiracy. Because the reasons discussed more fully require the dismissal of the Complaint, I have not considered these arguments of the defendants."

said highway travels. Said Federal Highway 17 runs roughly parallel to the Atlantic coast line and most of the areas through which said highway runs are either inlets from the sea and marshy or the wide expanse of the many rivers which empty into the ocean along this part of the coast and consisting of the St. Mary's River and Nassau River and the tributaries leading into such rivers."

In brief, all of the damages averred in the complaint and all that are shown to be probable have been suffered or will accrue from the denial of the right to use this "only feasible route", which in turn results from the denial of a permit by the State Road Department of Florida, and from the rules and regulations governing the use of County roads by the Board of County Commissioners of Duval County, Florida. It is not claimed that either the State Road Department or the Board of County Commissioners was acting beyond its respective jurisdiction, or that for any other reason its action was invalid.

As so forcibly illustrated in Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183, "Injury implies violation of a legal right." The plaintiff had no legal right to use the state highway without a permit from the State Road Department, nor the county roads without permission of the Board of County Commissioners, and those authorities have decided against the plaintiff. So long as their decisions stand the plaintiff has not been legally injured, notwithstanding it may have been irreparably damaged. In the case mainly relied on by the appellant, Angle v. Chicago, St. Paul, etc., Railway, Co., 151 U.S. 1, 14 S.Ct. 240, 38 L.Ed. 55, the plaintiff's legal rights had been violated because the defendant had wrongfully induced another company to break its contract with plaintiff with resultant damages independent of the Legislature's action. In that case, there was a legal injury to plaintiff. Here there is no such injury and no probability of injury. Of the other cases relied on by appellant, American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575, and United States v. New York Great Atlantic & Pacific Tea Co., 5 Cir., 137 F.2d 459, 464, were criminal prosecutions to the maintenance of which private injury was not essential.

If either the State Road Department or the Board of County Commissioners should reverse or change its position, or if another feasible route should be discovered, and legal injury should accrue or be probable from the alleged illegal territory agreement and unlawful conspiracy and combination, the plaintiff should be permitted to amend, or a new complaint might be filed, whereupon the other important questions presented by the motions to dismiss and which we have not considered may have to be considered and decided. For that purpose, the provision "without leave to the plaintiff to amend" is stricken from the judgment, and as so modified the judgment is affirmed.

Modified and affirmed.