**E. A. McQUADE TOURS, INC., Plaintiff-Appellee-Cross Appellant,**

v.

**CONSOLIDATED AIR TOUR MANUAL COMMITTEE et al., Defendants-Appellants-Cross Appellees.**

No. 71–2457.

United States Court of Appeals, Fifth Circuit.

Aug. 21, 1972.

Rehearing and Rehearing En Banc Denied Oct. 10, 1972.

Certiorari Denied Jan. 8, 1973. See 93 S.Ct. 912.

Barry R. Davidson, Alfred L. Mc-Carthy, Miami, Fla., Gambrell, Russell, Killorin, Wade & Forbes, E. Smythe Gambrell, Harold L. Russell, Wayne T. Elliott, Atlanta, Ga., for appellants; McCarthy, Steel, Hector & Davis, Miami, Fla., of counsel.

Thomas M. Coker, Jr., Fort Lauderdale, Fla., Morris J. Levin, Washington, D. C., for appellee.

Before PHILLIPS,* THORNBERRY and RONEY, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an appeal from a judgment of the district court entered on May 10, 1971, pursuant to a jury finding that the Consolidated Air Tour Manual Committee (CATM) and its member airlines had engaged in unlawful restraints of trade. As a result of that finding, E. A McQuade Tours, Incorporated (McQuade), was awarded three-fold the damages found by the jury, plus costs and attorney's fees, in the sum of $131,825.06. Both parties have appealed on numerous grounds. The facts are important to our disposition of this appeal, so we must state them in some detail.

McQuade is engaged in the business of wholesaling tour packages in Florida, the Caribbean, and the Bahamas. Its tour packages are sold through retail travel agents and the defendant airlines in conjunction with air transportation, and include hotel accommodations, meals, surface transportation, and sightseeing trips. CATM, a committee composed of representatives of the member air carriers, publishes a consolidated listing of available tour programs (hereinafter referred to as the Manual) under authority granted by the Civil Aeronautics Board (CAB), pursuant to Section 412 of the Federal Aviation Act, 49 U.S.C. § 1382.[1] CATM's refusal, on two occasions, to list McQuade tours in the Manual is at the heart of this dispute.

---

\* Hon. Orie L. Phillips, of the Tenth Circuit, sitting by designation.

1. The statute provides, in pertinent part:
   (a) Every air carrier shall file with the Board a true copy . . . of every contract or agreement . . . affecting air transportation . . . between such air carrier and any other air carrier . . . for pooling or apportioning earnings . . ., or relating to the establishment of transportation rates . . ., or for preserving and improving safety, economy, and efficiency, of operation, or for con-

trolling . . . destructive . . . competition, or for regulating stops . . ., or for other cooperative working arrangements.
   (b) The Board shall by order disapprove any such contract or agreement, whether or not previously approved by it, that it finds to be adverse to the public interest, or in violation of this Act, and shall by order approve any such contract or agreement, or any modification or cancellation thereof, that it does not find to be adverse to the public interest, or in violation of this Act . . . .

CATM was formed for the express purpose of consolidating into one manual a listing of air tour programs available through tour operators. The Committee functions through a general chairman, area chairmen, and the carrier representatives who transact CATM business at periodic meetings. All programs which a tour wholesaler (operator) desires to be included in the Manual are submitted to the appropriate area chairman and are approved or disapproved by the Committee. The Manual is published twice annually, one issue covering the eight-month spring/summer/fall period (Summer Manual) and one issue covering the four-month winter period (Winter Manual), and is divided into several geographic areas—e. g., Alaska, Bermuda, Puerto Rico, Fort Lauderdale, and Miami.

When a customer, desiring to purchase an air tour, contacts a retail travel agent, the agent often selects a suitable tour from the Manual and either (1) contacts the air carrier over whose route the transportation will be sold, who in turn requests booking from the tour operator offering the program in the Manual, or (2) contacts the tour operator directly and requests booking. The tour operator's agreement with the hotels generally specifies that the tour operator will receive a fifteen percent commission on the hotel accommodations sold through the operator. The retail travel agent involved receives two-thirds of the operator's commission. If the customer bypasses the retail travel agent and goes instead directly to the airlines, the process remains unchanged except that the tour operator retains the full fifteen percent commission.

Prior to publication of the Summer Manual of 1968, hotels in the Florida area, including those in Fort Lauderdale and Miami, had always been represented in the Manual on the basis of only one tour operator for each hotel. Since its inception, CATM has listed multiple tour operators as representatives for the individual hotels in all other areas except Nevada.[2] CATM contends that the Florida practice arose many years prior to CATM's formation and represented a policy of the hotels and tour operators in that area in which it had no authority or interest. It is fairly clear, however, that CATM by its attitude and procedures perpetuated the practice to the extent that many in the tour business came to look upon the historic one tour operator per hotel relationship in Florida as a CATM rule.[3] Prior to 1968, a tour operator's presentation of a program and the room rates for a hotel was accepted by CATM as evidence of authority from a Florida hotel for the operator to represent that hotel in the Manual, and no specific evidence of authority was required.

McQuade had been in business as a tour operator prior to CATM's first publication and has participated in the Manual since its origin. As of the time of trial, McQuade had submitted over 2,000 tour programs for publication in the Manual. All but the twelve programs involved in the instant case were approved by CATM and published.

CATM first refused to publish a McQuade program in 1965. In 1964, after the Fort Lauderdale Sheraton Hotel was first opened, McQuade had represented it, along with other hotels in the area, in the 1964–65 Winter Manual. In early 1965, McQuade again submitted a program for the Sheraton for the 1965 Summer Manual, providing rate sheets and a tour operator agreement with the hotel to the Florida area chairman of CATM. Simultaneously, American Express, another tour operator, submitted a program for the same hotel. There was some indication at the time that the Sheraton desired to appoint several tour operators as its representatives in the Manual. The CATM area chairman,

---

2. Nevada hotels act as their own wholesalers and are not represented in the Manual by tour operators.

3. Brief for Cross-Appellant at 11.

however, treated the dual submission as a conflicting representation and asked the Sheraton to clarify which tour operator was to represent it in the Manual. In an ambiguous reply, the hotel advised CATM that it was "authorized to insert American Express in Consolidated Manual." The area chairman interpreted this as an instruction to exclude McQuade, and accordingly rejected McQuade's submission.

The second instance of CATM's refusal to publish McQuade tours occurred roughly three years later. In 1967, CATM received requests from many tour operators that multiple tour operators be allowed to represent individual hotels in Florida. CATM responded by advising all parties concerned that, contrary to popular belief, there was no CATM policy or rule limiting Florida hotels to representation by one tour operator and that it was up to the hotels and the operators to determine their representative status. McQuade never before having submitted programs for Miami Beach and assuming that the Manual would thereafter provide multiple tour operator listings, solicited a number of hotels in Miami Beach to enter contracts authorizing McQuade to represent them as a tour operator. The contracts conferred upon McQuade the status of "officially approved wholesaler subject to all rights, privileges, and commission structure extended to any and all other tour operators so recognized by Hotel." Seven of the hotels contacted amended the authorization contract specifically to prohibit McQuade from representing them in the Manual. Eleven hotels entered into the contracts without alteration in the latter part of 1967.

The Committee in 1967, anticipating multiple tour operator submissions for some Florida hotels in the upcoming Manual, devised new rules to govern the operators' requests for listing in the Manual. These socalled "rules of the road" required, among other things, each tour operator to provide written authority from each hotel or motel expressly certifying that he was authorized to represent it in the Florida Manual. After these rules had been approved by a majority of the members of the Committee, the Florida area chairman sent copies and explanations of the rules to member airlines, hotels, and tour operators who had expressed a desire to participate in the Manual. By their terms the rules of the road were clearly limited in application to the Florida section of the Manual and were never applied to any other section.

Although subsequent events are in much dispute, the following facts seem clear. McQuade submitted its tour programs for the eleven Miami Beach hotels, as well as the contracts it had earlier completed with them. The Committee accepted McQuade's programs, along with Miami Beach programs submitted by eight other operators, on the condition that the operators furnish express written authorization to represent the hotels in the Manual. The other eight operators furnished the requested proof of authorization. McQuade did not, and was ultimately excluded from the Miami section of the Manual by reason of its failure to furnish the specific authorization required by the rules of the road.

McQuade filed the instant action in the court below contending that it was entitled to treble damages pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2,[4] and Section 4 of the

4. Section 1 of the Sherman Act provides in part as follows:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ·is declared to be illegal . . . . .

Section 2 of that Act declares:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall

Clayton Act, 15 U.S.C.A. § 15,[5] for CATM's improper exclusion of its programs from the 1965 and 1968 Manuals. After a jury verdict was returned in McQuade's favor in the amount of $27,500, judgment was entered for treble that amount, plus costs of $2,325.06 and attorney's fees of $47,000, for a total of $131,825.06.

I.

Among the numerous grounds for reversal asserted by CATM, it argues that McQuade lacked standing to bring this suit. To have standing to sue under Section 4 of the Clayton Act, plaintiff must prove injury to his business or property resulting from defendant's conduct. *E. g.* Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); Martin v. Phillips Petroleum Co., 5th Cir. 1966, 365 F.2d 629, cert. denied, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451. The injury referred to implies the violation of some legal right vested in the plaintiff. *E. g.* Okefenokee Rural Electric Membership Corp. v. Florida Power & Light Co., 5th Cir. 1954, 214 F.2d 413.

CATM contends that McQuade has no such status as an injured party because this suit is based on a non-existent right to represent certain hotels in the Manual. CATM thus focuses our attention on the construction of the contracts between McQuade and the subject hotels. The record indicates that in 1965, McQuade held a contract with the Fort Lauderdale Sheraton for exclusive rights to representation in the Manual. American Express, however, held the same "exclusive" right, a situation giving rise to the Sheraton's ambiguous directive to

"insert American Express in Consolidated Manual." In 1968, McQuade held contracts with eleven Miami Beach hotels for representation as a wholesale tour operator subject to the rights of other tour operators. It was established that, at the time, two of these eleven hotels were bound by a prior agreement of exclusive representation in the Manual with another tour operator. The contracts submitted by McQuade to the Miami Beach hotels were accompanied by a letter which read as follows:

> I would bring to your attention that this contract and proposed arrangement intends in no way to supersede, nullify or alter in any way any existing arrangements or contracts currently existing between your motel and any other tour operator or operators, but is proposed for the sole purpose of enabling our company to merchandise and promote package tour sales for you through the retail travel trade.

As the quoted passage reveals, no right of representation in the Manual was referred to in McQuade's letters. Moreover, its tour operator agreements with the eleven hotels were silent concerning its right to represent them in the Manual, and management personnel of each of the hotels testified that the contracts with McQuade were in no sense intended to grant it such rights. CATM argues that these surrounding circumstances indicate clearly that McQuade had no contract right to represent the hotels in the Manual.

McQuade urges us to construe the contracts on their face, without regard to the circumstances, and in effect claims that its actual authority to represent the

be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

5. Section 4 of the Clayton Act is as follows:
   Any person who shall be injured in his business or property by reason of any-

thing forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

hotels in the Manual was of no concern to CATM, whose only legitimate interest was in ensuring that McQuade was an approved wholesaler. We find, however, that McQuade had a property right in its contracts with the subject hotels, even assuming that they gave it rights only as an approved wholesaler. Even if it had no right to represent the hotels in the Manual, it nonetheless had the right to conduct tours through the hotels on a profitable basis. There is little doubt that this right was made virtually worthless by CATM's refusal to include the tours in the Manual. This court has held that a valid contract is property within the meaning of Section 4 of the Clayton Act. North Texas Producers Assoc. v. Young, 5th Cir. 1962, 308 F.2d 235, cert. denied, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963). One who alleges impairment of rights under such a contract thus establishes the requisite "injury to property."

■ In so holding, we recognize that Okefenokee Rural Electric Membership Corp. v. Florida Power & Light Co., 5th Cir. 1954, 214 F.2d 413, arguably might be taken to mean that the proper focus is McQuade's supposed right vis-a-vis CATM to represent the hotels in the Manual, not its rights to conduct tours through the hotels. The alleged restraint of trade in *Okefenokee* resulted from the joint efforts of two power companies in preventing the Florida State Road Department from granting plaintiff, a competitor of the two companies, a permit to build a new line. In affirming the district court's dismissal of the suit, this court reasoned that, because plaintiff had no right to build its line over the proposed route without prior approval of the Road Department, denial of the permit did not impair a right vested in the plaintiff. Following this reasoning, one might argue that, if McQuade had no right to a listing in the Manual, then CATM's refusal to list it does not meet the "legal injury" test. We believe, however, that *Okefenokee* should be limited to its precise facts. First, there was no indication that

plaintiff in that case had third-party contract rights that were impaired by the alleged antitrust violation. Here, of course, the value of McQuade's contracts with the hotels was greatly diminished by CATM's excluding its programs from the Manual. Secondly, the alleged violation in *Okefenokee* arose from action by a governmental agency, the Road Department, and from efforts by two public utilities to influence that agency. *Okefenokee* is thus more closely akin to cases involving the notion of "valid governmental action," *see* Woods Exploration & Producing Co. v. Aluminum Co. of America, 5th Cir. 1971, 438 F.2d 1286, cert. denied, 404 U.S. 1047, 92 S. Ct. 701, 30 L.Ed.2d 736 (1972), than to cases examining the requirement of legal injury in a context of private action. Accordingly, we decline to apply *Okefenokee* to the facts of this case, and conclude that injury to McQuade's contract rights with the hotels is sufficient to confer upon McQuade standing to sue under Section 4 of the Clayton Act.

■ Moreover, even assuming that CATM's contention with regard to the contracts with the hotels were to be accepted, we would nevertheless be compelled to allow McQuade to continue. Section 4 is phrased in the disjunctive; an injury to either business or property will suffice, and McQuade has clearly shown the former. In most cases finding such injury, plaintiff was directly engaged in the sale of products or services in the line of commerce restrained. *See, e. g.,* Waldron v. British Petroleum Co., Ltd., S.D.N.Y.1964, 231 F.Supp. 72. In the instant case McQuade was in business as a tour operator at all pertinent times. The record establishes that inclusion in the Manual is virtually an absolute necessity for success in the tour industry. It thus cannot be questioned that CATM's excluding McQuade injured it in its business. CATM would contend that it had no choice but to exclude McQuade because it did not have authority from the hotels to be included in the Manual. This argument, however, goes not to whether McQuade has stand-

ing to sue, but rather to whether CATM violated the antitrust laws, *i. e.*, whether its conduct constituted an unreasonable restraint of trade. We find, therefore, that McQuade was clearly injured in its business or property by CATM's rejection of his tour programs in both 1965 and 1968 and thus has standing to assert whatever rights it might have under the antitrust laws.

## II.

This brings us to the most significant issue in the case—whether, and to what extent, McQuade has any rights under the antitrust laws. With regard to McQuade's claim that CATM's refusal to list its tours in the 1965 and 1968 Manual resulted from a "contract, combination, or conspiracy in restraint of trade," the trial court instructed the jury as follows:

> If you find from a preponderance of the evidence that the rules adopted by the defendants were unnecessary, you must find for the plaintiff.[6]

Inquiry into the "necessity" of the rules was prompted by CATM's argument that the Civil Aeronautics Board had approved publication of the Manual and that all rules necessary to accomplish that end were accordingly immune to antitrust prohibitions under Section 414 of the Federal Aviation Act, 49 U.S.C.A. § 1384.[7] By means of the quoted instruction, the trial court in effect told the jury that, if CATM's conduct was not clad in antitrust immunity, then Mc-

Quade's exclusion would be illegal *per se,* without regard to the reasonableness of CATM's standards or of their application to McQuade.[8] CATM contends that the trial court erred in failing to apply the rule of reason, thus erroneously preventing the jury from considering whether CATM's standards for accepting tour programs, and the enforcement of those standards against McQuade, were a reasonable means of accomplishing the joint, economically productive effort of publishing a reliable manual.

The fundamental principle for determining the legality of conduct under the Sherman Act was announced in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), where the Court held that Section 1 reached only "undue" or "unreasonable" restraints. This so-called "rule of reason" was later explained by Justice Brandeis in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.

This Circuit is likewise firmly committed to the rule of reason. *E. g.,* Harrison v. Prather, 5th Cir. 1970, 435 F.2d

---

6. R. 1206.
> This instruction refers to McQuade's claim under Section 1. Aside from a brief reference to the Section 2 claim, the trial court did not clearly instruct the jury as to McQuade's contention that CATM's excluding its tours was monopolization or an attempt to monopolize. The party's briefs do not touch on the Section 2 claim as such.

7. This statute provides that
> [a]ny person affected by any order made under sections 408, 409, or 412 of this Act shall be, and is hereby, relieved from the operations of the "antitrust laws," . . . insofar as may be necessary to enable such person to

> do anything authorized, approved, or required by such order.
> Owing to our disposition of this appeal, we do not reach the issue of antitrust immunity. Nor do we reach a second contention by CATM, that McQuade's claims fall within the primary jurisdiction of the Civil Aeronautics Board.

8. Our interpretation of the quoted instruction is buttressed by the following remark made by the trial judge during preparation of the charge:
> [M]y ruling is that if these rules were not necessary, that as a matter of law this would be a violation of the federal statutes.
> R. 1112.

1168, cert. denied, 404 U.S. 829, 92 S.Ct. 67, 30 L.Ed.2d 59 (1971); North Texas Producers Assoc. v. Young, 5th Cir. 1962, 308 F.2d 235, 240, cert. denied, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963).

■ There is, however, a well-defined exception to this general principle. Certain arrangements are conclusively presumed to be unreasonable restraints of trade, simply by virtue of their obvious and necessary effect on competition. *See* Northern Pacific Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Once the existence of such an arrangement has been established, no evidence of actual public injury is required, Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), and no evidence of the reasonableness of defendant's conduct will be considered in justification. *See Northern Pacific, supra.* This rule of *per se* illegality has been applied thus far to horizontal and vertical price fixing agreements,[9] division of markets between competitors,[10] tying arrangements,[11] and certain collective refusals to deal, or "group boycotts." [12]

McQuade would have us characterize CATM's exclusion of its tour as a group boycott to which the *per se* rule was properly applied. McQuade's argument is deceptively simple: A combination of airlines (CATM) controls a resource (listing in the Manual) that is essential to McQuade's ability to compete in the wholesale tour market. The airlines' collective refusal to list him in the Manual has impaired his ability to compete, and thus is a *per se* violation of the Sherman Act. While we agree with McQuade that the airlines collectively refused to deal with it, we do not agree that CATM's conduct is to be governed by the *per se* rule.

Cases applying *per se* illegality to collective refusals to deal fall into roughly three categories. The first group, exemplified by Eastern States Retail Lumber Dealers Assoc. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L. Ed. 1490 (1914), have involved horizontal combinations among traders at one level of distribution, whose purpose was to exclude direct competitors from the market. Thus, in *Eastern States,* a combination of retail lumber dealers black-listed lumber wholesalers who sold directly to the retailers' customers. The obvious purpose of the combination— eliminating competition from the wholesalers—placed it "within the prohibited class of undue and unreasonable restraints." 234 U.S. at 612, 34 S.Ct. at 954. To the same effect are Associated Press v. United States, 326 U.S. 1, 65 S. Ct. 1416, 89 L.Ed. 2013 (1945); Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); and Thill Securities Corp. v. New York Stock Exchange, 7th Cir. 1970, 433 F.2d 264, cert. denied, 401 U. S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971).

Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), illustrates a second category of group boycott cases, involving vertical combinations among traders at different marketing levels, designed to exclude from the market direct competitors of some members of the combination. For example, in *Klor's,* a large appliance dealer, Broadway-Hale, used its purchasing power to induce defendant manufacturers and wholesalers to sell only at

---

9. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911) (vertical); United States v. Socony Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (horizontal).

10. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

11. Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

12. Fashion Originators Guild of America v. Federal Trade Comm'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

discriminatory prices to plaintiff, a competing appliance dealer. Since the effect of the agreement was to drive Klor's out of competition with Broadway, the Court found the three-cornered agreement illegal *per se*, notwithstanding the fact that the manufacturers and wholesalers, not in competition with Klor's probably had no such anti-competitive motive. *See also* Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc., 5th Cir. 1966, 365 F.2d 478.

Unlike these first two categories, the third group of cases has concerned combinations designed to influence coercively the trade practices of boycott victims, rather than to eliminate them as competitors. The leading case in the area is Fashion Originators Guild of America v. Federal Trade Comm'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), in which a group of "original" designers refused to sell their creations to retailers who purchased and sold copies of the original designs. In holding this refusal to deal illegal *per se*, the Court declared that even though the object of the boycott was to prevent the retailers from dealing with manufacturers of the copies and thereby eliminate "style piracy," the coercion practiced indirectly on a rival method of competition precluded application of the rule of reason. *See also* Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (liquor manufacturers' collective refusal to sell to price-cutting wholesalers).

■ In all of these cases, the touchstone of *per se* illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as "naked restraints of trade," and have fallen victim to the *per se* rule. On the other hand, where these elements have been missing, the *per se* rule has not been applied to collective refusals to deal. *See,*

*e. g.*, Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 9th Cir. 1969, 416 F.2d 71, cert. denied 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), holding that a concerted refusal by two manufacturers to renew plaintiff's exclusive sales rights was not *per se* illegal because the refusal was motivated solely by the manufacturers' concern for the integrity of their distribution systems. We conclude that resort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the arrangement in question is a "naked restraint of trade." Absent these factors, the rule of reason must be followed in determining the legality of the arrangement. *See* Von Kalinowski, The Per Se Doctrine—An Emerging Philosophy of Antitrust Law, 11 U.C.L.A.L.Rev. 569 (1964); Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa. L.Rev. 47 (1955).

■ The proper inquiry in the case at hand is therefore whether CATM's refusal to list McQuade tours in the Manual displays the exclusionary or coercive element necessary for invoking the per se rule. The record is barren of any such indication. First, McQuade neither alleged nor proved that CATM's conduct was motivated by a desire to exclude McQuade from the wholesale tour market; indeed, it is difficult to imagine such a motive on CATM's part, because neither CATM nor its member airlines are in direct competition with McQuade in the wholesale tour market, and no proof was offered to indicate that CATM or the airlines were monopolizing or attempting to monopolize that market. Nor is there the slightest hint that the refusal to list McQuade tours was an attempt to somehow influence McQuade's business practices and thereby achieve some anticompetitive goal of CATM.

Secondly, there is no suggestion anywhere in the record that CATM combined or conspired with McQuade's natural competitive enemies, the other tour

operators, to deprive McQuade of a vital listing in the Manual. Finally, there is nothing to suggest that CATM applied its standards to McQuade in a discriminatory fashion. At most, the record supports the inference that CATM was careless in failing to request a clarification of the ambiguous 1965 Sheraton directive, and was overly cautious in its interpretation of McQuade's Miami Beach contracts in 1968. In sum, we believe that the *per se* rule is not applicable to the case at hand.

■ The trial court's *per se* instruction was therefore erroneous. We believe that a new trial of this case would be costly and unproductive. Thus we consider whether McQuade's exclusion from the Manual was an unreasonable restraint of trade. We have already suggested that CATM's rejection of McQuade's program for the Fort Lauderdale Sheraton in 1965 was reasonable under the circumstances. Faced with apparently conflicting submissions for the hotel, the area chairman sought instructions from the Sheraton. The reply he received, while ambiguous, could nevertheless reasonably be interpreted as a statement that the Sheraton did not desire McQuade to represent it in the Manual. All the evidence points to the conclusion that CATM would have accepted either McQuade or American Express, leaving the choice entirely up to the Sheraton. As to the 1965 incident, therefore, any injury that McQuade might have suffered was attributable to the Sheraton, not CATM.

As to the 1968 incident, the adoption and enforcement of the rules of the road must be viewed in light of the pre-1968 custom of limiting representation of a hotel to one tour operator. Regardless of whether this limitation was a CATM policy or whether it was simply a historical practice of the tour business, CATM in 1967 declared a policy of multiple listings for each hotel. This decision called for the adoption of standards to govern submissions of tour programs. There was testimony at trial that the airlines believed that they impliedly warranted the responsibility and fiscal integrity of operators listed in the Manual. Moreover, there was undisputed evidence that responsible tour operators would not seek listing in the Manual without some assurance that other operators listed were themselves responsible; and failure to attract responsible operators would have doomed efforts to publish the Manual. Finally, since several operators would be submitting programs for the same hotel, considerations of administrative convenience required proof that the operators were in fact authorized to represent a hotel in the Manual.

These interests all represent legitimate business objectives of CATM. There is not the slightest suggestion that the rules of the road were meant to serve any but the objectives stated. Moreover, there is undisputed evidence that the rules could be complied with easily and quickly. We conclude that the rules were reasonable on their face.

Nor were the rules applied to McQuade arbitrarily or discriminatorily. All interested tour operators, including McQuade, were on notice of the rules. The Miami Beach programs of eight other operators were accepted, just as McQuade's were, on the condition that they provide proof of authority from the hotels. The other operators furnished express authorization; McQuade did not, choosing to rely on its tour operator agreement, which cannot reasonably be construed as giving McQuade the right to represent the hotels in the Manual.

Thus, we hold that the facts in this case do not present a violation of the Sherman Act by CATM. Accordingly, the judgment of the district court is reversed with directions to dismiss.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge

in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.