**PERFORMANCE MARKETERS, INC., Plaintiff,**

v.

**EDELBROCK CORPORATION, et al., Defendants.**

**Civ.A.No. 3–79–1053–H.**

United States District Court,
N. D. Texas,
Dallas Division.

April 30, 1981.

Curtis L. Frisbie, Jr., Gardere & Wynne, Dallas, Tex., for plaintiff.

Jerry L. Bean, Strasburger & Price, Dallas, Tex., for defendant ACF Industries, Inc.

## MEMORANDUM OPINION

SANDERS, District Judge.

This antitrust case is presently before the Court on Defendant ACF Industries, Inc.'s ("ACF") Motion for Summary Judgment, filed February 20, 1981. Plaintiff Performance Marketers, Inc. ("PMI") filed a response to the Motion, and oral argument was heard on March 20, 1981. In its Motion, ACF seeks partial summary judgment with respect to the Sherman Act § 1 (15 U.S.C. § 1) claim pled by PMI in Count One of the Amended Complaint, in addition to several but not all of the state common law claims founded on this Court's diversity jurisdiction. The Court is of the opinion that partial summary judgment should be granted on the Sherman 1 claim; the Court reserves ruling with respect to the other claims for the present.

In the course of this litigation, PMI has already weathered several successful and unsuccessful challenges to its ability to maintain an action against Defendants based on violations of the federal antitrust laws. The Original Complaint failed to state a *per se* antitrust violation in the nature of a group boycott due to PMI's failure to allege the necessary horizontal element that a competitor of PMI was a member of the conspiracy or combination. Memorandum Opinion, January 2, 1980. Thereafter, the Court allowed PMI to amend its Sherman 1 pleadings in an effort to cure the defect by naming (but not su-

ing) an additional co-conspirator, Dick Roy, who allegedly became a competitor of PMI's as a product of the conspiracy. Memorandum Opinion, March 26, 1980. In granting leave to amend, the Court acknowledged that it had reservations about whether sufficient evidence could be adduced to bring PMI's cause of action within the facts and holdings of such group boycott cases as *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), or whether it more properly belonged among the dealer substitution cases out of the Fifth Circuit. The time has now come to finally address this question of law on ACF's summary judgment motion.

ACF contends that the result in this case is mandated by a long line of Fifth Circuit authority holding that a manufacturer or supplier may switch dealers by "conspiring" with a new dealer to take the place of an established one. Without more, there is no violation of Section 1 of the Sherman Act. See *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266 (5th Cir. 1979); *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Burdett Sound, Inc. v. Altec Corporation*, 515 F.2d 1245 (5th Cir. 1975).

PMI concedes that, if this were a case where one manufacturer, acting alone, substituted a new distributor for his old one, then the *Burdett Sound* line of cases would foreclose recovery under Section 1 of the Sherman Act. PMI argues, however, that there is an added element in this case—the "something more" that would distinguish it from the garden-variety dealer substitution case. PMI believes that a *per se* Sherman 1 violation inheres in the concerted efforts by all of the Defendants herein to terminate the distributorship arrangements they previously had with PMI and to replace PMI with a new distributor who had himself participated in the alleged concerted action. This "joint and conspiratorial" action to exclude PMI from the market place, in PMI's view, places this case not within the *Bur-*

*dett Sound* line but in among the group boycott doctrine, exemplified by such Fifth Circuit cases as *Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.*, 383 F.2d 97 (5th Cir. 1967); *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978); and *Coughlin v. Capitol Cement Co.*, 571 F.2d 290 (5th Cir. 1978). *See also Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Klor's, Inc. v. Broadway-Hale, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1958); *Blackburn v. Crum & Forster*, 611 F.2d 102 (5th Cir. 1980); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972).

Specifically, PMI contends that the present situation falls within the second of the three recognized categories of cases in which collective refusals to deal have been held to be *per se* illegal. *See, e. g., E. A. McQuade, supra*, 467 F.2d at 186. This category, the "group boycott" doctrine, involves vertical combinations among traders at different marketing levels, designed to exclude from the market a direct competitor of some member of the combination. *Id.* Here, PMI alleges that a vertical combination composed of the Defendants and Roy, the distributor who replaced PMI, sought to exclude PMI from the market. This doctrine is exemplified by *Klor's, supra,* where a large appliance dealer used its considerable purchasing power to induce manufacturers and wholesalers to sell only at discriminatory prices to plaintiff, a neighboring appliance dealer with a penchant for price cutting. The Supreme Court found the agreement to be illegal *per se* because its effect was to drive the smaller price-cutter out of competition with the larger appliance dealer.

■ In cases such as *Klor's*, the general "rule of reason" gives way to a well-defined exception for *per se* illegality. Certain arrangements are conclusively presumed to be unreasonable restraints of trade, simply by virtue of their obvious and necessary effect on competition. Once the existence of such an arrangement has been established, no evidence of actual public injury is required and no evidence of the reasonableness of a defendant's conduct will be considered in justification. *E. A. McQuade*, 467 F.2d at 186.

■ In *Klor's*, the efforts of a retailer with monopolistic purchasing power to induce his suppliers to discriminate in pricing against a competitor did indeed have an obvious and necessary effect on competition. Equally obvious was the design or purpose of the combination to exclude the smaller competitor from the market place. The effect on competition of the alleged combination between Roy and the defendant manufacturers in this case is not nearly so obvious. In the eyes of the Fifth Circuit, the touchstone of *per se* illegality has been the purpose and effect of the arrangement in question; the presence of exclusionary or coercive conduct is necessary to justify the applicability of the *per se* rule. *E. A. McQuade*, 467 F.2d at 187. PMI has failed to demonstrate by proper summary judgment evidence that there is a genuine issue of fact whether any action taken by Roy and the Defendants had the express purpose of driving PMI out of business. *See Dougherty v. Continental Oil Co.*, 579 F.2d 954, 961 & n.3 (5th Cir. 1978).

The Court does not rest the grant of partial summary judgment solely on its view of this case within the analytical framework of the group boycott doctrine. As is the case with so many lawsuits, the essential problem with which the parties and the Court have been grappling since the inception of this litigation is one of characterization or classification. While it can be said that the facts presently before the Court bear an arguable resemblance to the group boycott "formula" (*i. e.*, a vertical combination of traders at different marketing levels, including a direct competitor of the plaintiff-victim), the Court believes that the situation more closely resembles the schema of the distributorship substitution cases. To be sure, it is distributorship substitution with a twist—rather than the individual decision of a single manufacturer to replace an exclusive distributor, this case

presents the simultaneous and allegedly concerted decisions by several manufacturers to terminate a common distributor and replace it with another. There has not yet been a case in this circuit involving group decisions to change distribution systems for a given product. There are authorities from other circuits, however, which offer guidance in these uncharted waters. These cases indicate that manufacturers may collectively switch their business from one distributing firm to another without running afoul of the antitrust laws, if the collective decision is motivated by legitimate economic considerations and not the desire to ruin the business of the old distributor.

The rationale for abandonment of the *per se* rule in cases of collective decisions to substitute common distributors has been summed up as follows:

> "First, it is often thought necessary for manufacturers to switch distributors *en masse* in good faith because of economies of scale. Second, such a switch is not thought to diminish competition since, after the decision to do business with a new distributing firm, the same number of firms are distributing the manufacturer's products as before, *i. e.,* one."

*Taxi Weekly, Inc. v. Metropolitan Taxicab Bd. of Trade,* 539 F.2d 907, 912 (2d Cir. 1976). *See also, Cartrade, Inc. v. Ford Dealers Advertising Ass'n of So. Cal.,* 446 F.2d 289, 294 (9th Cir. 1971); *Interborough News Co. v. Curtis Publishing Co.,* 225 F.2d 289, 293–94 (2d Cir. 1955).

In *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), plaintiff alleged that two separate liquor distillers combined to terminate it as distributor of the products of one of them, so that both distillers could use a competing distributor for both their lines of liquor. The Ninth Circuit found that the actions of the defendants did not violate Section 1 of the Sherman Act, emphasizing the absence of any coercive or anticompetitive intent vis-a-vis the plaintiff:

> "Here, plaintiff presented no evidence whatever that either Seagram or Barton had any *anticompetitive* motive for terminating plaintiff as their distributor. There were no price fixing or other similar motives or demands or activities. There had been no anticompetitive practices imposed by either Seagram or Barton on plaintiff; none was imposed on McKesson [the distributor that replaced plaintiff]; McKesson sought none. Of course, McKesson wanted the part of the business that it got. But there is no evidence that either McKesson or any of the other defendants were primarily motivated by a desire to damage plaintiff or put it out of business."

416 F.2d at 78 (emphasis in original).

Such an anticompetive intent or effect was found to exist in the case of *Industrial Building Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336 (9th Cir. 1970). *Industrial* involved a manufacturer with a dominant market position who, after merging with another company, replaced a system of independent distributors with an in-house distribution system of direct sales to the public and solicitation of customers; in effect, the manufacturer entered into competition with its former distributor, selling directly to its distributor's customers at below-wholesale prices, and a competitor of the manufacturer was removed from the market. The court held:

> "When a distributor is replaced by another, the public is given a substitute with no diminution in the number of distributors offering services, but when the manufacturer enters the field and then removes a distributor, the public is left with only the manufacturer instead of the manufacturer and the independent distributor. Accomplishment of this anticompetitive objective by a manufacturer in a dominant market position by means of conspiracy and unfair tactics must surely be proscribed by the antitrust laws."

437 F.2d at 1342–43. The restraint on trade or anticompetitive effect of this maneuver was manifested, first, in the public injury

caused by the loss of an independent distributor who could handle competing products in an unbiased, objective manner, and second, in the additional power over price control afforded the manufacturer by the elimination of its major independent distributor.

In a later case, however, the Ninth Circuit emphasized that there must be some restraint of trade beyond the loss of business suffered by the distributor or the market's loss of a distributor before a group termination of an independent distributor in favor of an in-house distribution system will constitute an antitrust violation. *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 803 (9th Cir. 1976). In *Knutson*, the manufacturer did not have a dominant position in the relevant market and the plaintiffs failed to prove that its actions had any *actual* horizontal anticompetitive effect. Reaffirming *Industrial*, the court held that elimination of a distributor-competitor can be an unreasonable restraint "when either (a) 'unfair' predatory methods are used to force out the competitor, or (b) there is a market structure in which loss of a distributor will enhance a manufacturer's market power and tend to diminish the ability of other manufacturers to compete." 548 F.2d at 803. The *Knutson* plaintiffs, however, could prove neither of these elements, and the distributor substitution was permitted.

While the Fifth Circuit has had no occasion to add to the sparse literature of collective dealer substitutions, the Court is of the opinion that the Fifth would adhere to the principles derived in the other circuits, principally the Ninth. The Court notes that *Burdett Sound, supra*, the cornerstone of the Fifth Circuit's dealer substitution doctrine, relies heavily on and quotes extensively from *Hawaiian Oke, supra*, the Ninth Circuit case involving a *collective* decision to switch liquor distributors. Additionally, the Fifth Circuit cases after *Burdett* involving *individual* dealer substitutions caution that a Sherman 1 violation occurs only if the purpose or effect of the substitution is anticompetitive, the same criterion utilized in the collective substitution cases. Examples of anticompetitive intent or effect recognized by the Fifth Circuit include action taken expressly to drive plaintiff out of business; or in an attempt to monopolize; or to fix prices; or to force plaintiff to accept resale price restrictions or territorial allocations; or to increase the manufacturer's market dominance; or by a manufacturer engaging in predatory practices, as in *Industrial. See, Dougherty v. Continental Oil Co.*, 579 F.2d 954, 961 n.3 (5th Cir. 1978); *Northwest Power, supra*, 576 F.2d at 90–91.

■ In its summary judgment papers, PMI has gone to great lengths to establish that a genuine issue of fact exists as to whether all of the Defendants conspired together to terminate PMI as independent distributor for the products of each, and such a fact issue undoubtedly exists. However, even if such a conspiracy or combination were conceded to exist, PMI would have to establish the existence of an issue of fact as to the presence of anticompetitive intent or effect, in order to escape summary judgment on its Sherman 1 claim. PMI has failed to produce summary judgment evidence demonstrating that the termination of PMI has had an anticompetitive effect upon the business of selling performance automotive parts. *See Joe Regueira, Inc. v. American Distilling Co., Inc.*, 642 F.2d 826 (5th Cir. 1981). ACF does not have a dominant position in the performance carburetor market. While it alleges that the conspiracy was designed "to run PMI out of business," PMI does not offer any proper summary judgment evidence to raise a fact issue as to such motive. Nor does PMI proffer evidence of any anticompetitive effect such as price fixing, resale price maintenance, territorial allocations, or predatory practices in connection with an in-house distribution system. PMI does not demonstrate that any other competing manufacturer was affected by the termination of PMI or that the products of ACF or any other manufacturer are less available to the consuming public than they were before PMI's termination. Lastly, PMI has failed to raise a fact issue as to whether the termination of PMI was not in the best business interest of ACF, under the "rule of reason."

Although it is generally disfavored, a grant of summary judgment in complex antitrust cases has been upheld by the Fifth Circuit on numerous occasions. *See, e. g., Joe Regueira, Inc. v. American Distilling Co., Inc., supra; Blackburn v. Crum & Forster*, 611 F.2d 102 (5th Cir. 1980); *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107 (5th Cir. 1979); *Daniels v. All-Steel Equipment, Inc.*, 590 F.2d 111 (5th Cir. 1979); *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). Given the fully developed record before the Court on the relevant issues and the amount of discovery already completed in this case, the Court believes that PMI's failure to produce significant probative evidence of anticompetitive effect in opposition to the motion, instead of mere allegations thereof, warrants the grant of summary judgment.

Summary judgment is GRANTED in favor of ACF on Count One of PMI's Amended Complaint.

SO ORDERED.